1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| RUSHING,<br><br>                    Plaintiff,<br><br>        v.<br><br>ROBERT NEUSCHMID,<br><br>                    Defendant. | Case No.  18-cv-02351-BLF<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[Re:  ECF 11] |

Petitioner Pierre Rushing (a.k.a. Pierre Smith) is currently in the custody of Robert Neuschmid, warden at California State Prison, Solano in Vacaville, California.  In 2011, Rushing was convicted in Alameda County Superior Court of one count of first degree murder.  He was then sentenced to fifty years to life in prison.  Rushing has since unsuccessfully pursued direct and collateral review in California state court.  This matter now comes before the Court on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d).  ECF 11.  Having considered the parties' submissions, the record in the case, and the applicable law, the Court DENIES the petition and the request for an evidentiary hearing.

## I.    PROCEDURAL HISTORY

The following procedural history is undisputed, and therefore drawn from the Amended Petition (ECF 11 at p-1 to p-2) and the Answer (ECF 19-1 at 1-2).

On September 28, 2011, an Alameda County jury convicted Pierre Rushing of one count of first degree murder, Cal. Penal Code § 187; the jury also found several firearm enhancements, i.e., that Petitioner personally and intentionally discharged a firearm and caused great bodily injury (*id.* §§ 12022.7(a), 12022.53(d)), that Petitioner personally and intentionally discharged a firearm (*id.* § 12022.53(c)), and that Petitioner personally used a firearm (*id.* §§ 12022.5 (a), 12022.53(b), (g)).

United States District Court
Northern District of California

Petitioner appealed to the California Court of Appeal, Case No. A133769, and, while the direct appeal was pending, also filed a state habeas petition, Case No. A137965. The California Court of Appeal consolidated the two cases and, in 2013, issued an unpublished decision as to both. *People v. Smith*, No. A133769, 2013 WL 4017400 (Cal. Ct. App. Aug. 1, 2013), *as modified* (Aug. 27, 2013).

As to the direct appeal, the Court of Appeal affirmed the judgment against petitioner. The California Supreme Court later denied Petitioner's petition for review of the direct appeal (Case No. S212883). *See* ECF 18-16 (Exhibit 6: Petition and Order).

As to the habeas petition, the Court of Appeal found that petitioner had stated a prima facie case for relief on a claim of factual innocence based on newly discovered evidence and remanded the petition to the Superior Court for an evidentiary hearing; the court denied relief on the remainder of petitioner's habeas claims. *People v. Smith*, 2013 WL 4017400 at *12. The Superior Court held a 3-day evidentiary hearing in February and March 2017, after which it denied Petitioner's state habeas petition (Case No. 166345). *See* ECF 18-17 (Exhibit 8: Reporter's Transcript of evidentiary hearing; Exhibit 9: Order).

In September 2017, Petitioner filed a pro se federal habeas petition before this Court. *See* Docket for Case No. 17-CV-05195-BLF at ECF 1. After Respondent moved to dismiss for failure to exhaust state remedies for certain claims, the Court granted Rushing leave to withdraw the petition without prejudice to later refiling it. *Id.* at ECF 17. Shortly thereafter, in April 2018, Petitioner filed a second state habeas petition before the California Court of Appeal (Case No. A154055) in order to exhaust his claims. *See* ECF 18-18 (Exhibit 10: Petition). A few days later, Petitioner returned to federal court, this time represented by counsel. Petitioner filed a second federal habeas petition and a motion to stay the federal proceedings pending resolution of his second state habeas petition. ECF 1. This Court granted the motion for stay and abeyance. ECF 9.

Back in state court, the Court of Appeal denied the second state habeas petition (Case No. A154055) without a written opinion and Petitioner sought review by the California Supreme Court (S248512). In June 2018, the California Supreme Court denied review of the habeas denial. *See*

2

1   ECF 18-19 (Exhibit 11: Petition, Answer, Reply and Order).

2   Petitioner subsequently filed an Amended Petition and this Court lifted the stay and

3   reopened the proceedings.  ECF 11, 12.  That Amended Petition has been fully briefed and is now

4   before the Court.

5   ## II.   FACTUAL BACKGROUND

6   Below, the Court summarizes the factual evidence presented in this case (A) at trial and

7   (B) at the evidentiary hearing conducted by the Superior Court on collateral review.

8   ### A.   Facts Established at Trial

9   Petitioner adopts the California Court of Appeal's summary of the evidence presented at

10   trial. ECF 11("Pet.") at p-2; *see People v. Smith*, No. A133769, 2013 WL 4017400 (Cal. Ct. App.

11   Aug. 1, 2013), as modified (Aug. 27, 2013).  That summary is duplicated in full below, with

12   footnotes renumbered for continuity and alterations preserved.  Note that "Green" is Robert Green,

13   the only witness who "identified defendant as a participant in the killing" at trial. *People v. Smith*,

14   2013 WL 4017400, at *1.

15   <u>Green's testimony regarding the April 15, 2011, shooting</u>

16   In the early morning hours of April 15, 2011—between 3:30 and 3:45
17   a.m.—Green and Pat Smith (Smith)[1] arrived at an apartment building at 1406 77th
     Avenue in Oakland "to buy drugs."  Green testified that he had previously
18   accompanied Smith when he bought drugs from defendant at this same location,
     the first time a week or two before the incident.  On that occasion, Green stated,
19   he clearly observed defendant's face and heard his voice. Green had also seen
     defendant driving around the neighborhood in a grey sedan.

20
     On the occasion in question, Green testified that he and Smith arrived at
21   the apartment building in a red Volkswagen Jetta driven by Smith.  Green stayed
     in the car while Smith went inside to buy the drugs.  A few minutes later, Green
22   saw a man, later identified as the victim, Dawonye Taylor, exit the building and
     walk down the street.  Shortly thereafter, Smith and two men came out of the
23   apartment building.  Green identified one of the men as Andre, who he recognized
     "through buying drugs off him," and the third individual as defendant.  Green
24   testified that when he first saw defendant that night, his "name didn't click" but
     he recognized defendant "from somewhere."  Later that night he remembered that
25   defendant had introduced himself as "C" during their initial meeting. Green
26   testified that defendant is in fact the person he knew as "C."

27

28   ---
     [1] "Three persons named Smith were involved in the facts of this case.  None are related."

3

The three men got into the red Jetta. Defendant, wearing a black "puff coat," sat in the rear passenger seat behind Green. As the car took off in the direction Taylor was walking, defendant told someone on his cell phone "that somebody stole his iPod" and that "[he] shouldn't have left his iPod plugged up in the house." As the car approached Taylor, Green heard defendant say, "there he go right there" and defendant told Smith to "let him out of the car." Smith made a u-turn next to Taylor, stopping by a Giant Quarter-Pound Burger restaurant. Green testified that defendant and Andre got out of the car, pinned Taylor against the passenger door, and began hitting and kicking him in the face and chest. Defendant accused Taylor of stealing his iPod. As Green turned to speak to Smith, a single gunshot was fired. Green turned and saw defendant "holding a gun towards" Taylor, "pointing [the gun] towards [Taylor's] stomach." Green stated, "it appear[ed] that [defendant] had his hand on the trigger." Defendant and Andre got back in the car and Smith drove off, leaving Taylor to die on the street.

DeCarla Smith (Carla) testified that as these events unfolded, she was standing at a bus stop two blocks away. She saw a red Volkswagen make a u-turn and pull in front of the Giant Burgers restaurant. She recognized the car as belonging to Smith because two weeks before she had been in the car with him. She recognized Smith as the driver of the car, and saw that there were three occupants. Carla testified that after the car parked, someone exited the car, confronted the victim, and then one gunshot was fired. About 15 to 20 minutes later, Carla crossed the street and identified the victim as "2." Carla acknowledged that she had previously given different accounts of the incident to the police because she did not want to be seen as a snitch. She said the "theory on the street is what you see you don't see" but swore that her trial testimony was truthful.

Events leading to defendant's arrest

On the following day, April 16, Green approached an Oakland police officer and asked to speak with him about the shooting the day before. Officer Steve Walker confirmed that Green had approached him and he gave Green's contact information to a homicide investigator, Steven Nowak. Green met with Nowak on April 21, 2011. Green testified that during this initial meeting, he was shown a photo lineup from which he identified Andre as one of the men in the car on April 15, but he was unable to identify the other two men. Green gave the officer a description of "C" as brown skinned, about 5 feet 10 inches tall, with short hair, 20 years old, and around 120 pounds with a slim build. Green met with Nowak the next day, April 22, and identified Smith from a photo lineup, but was still unable to identify any photograph as a picture of "C."

On April 22, 2011, Officer Michele Melham spotted the red Jetta in a parking lot with Smith asleep in the front seat. Aware of the ongoing homicide investigation, Melham detained both Smith and the car. The car was dusted for fingerprints. Those of Smith, Green, and Carla were taken from the car, but no fingerprints of Andre or defendant were found.

On April 30, Green fortuitously saw defendant at a BART station wearing a red cap. He called Nowak and told him that he had just seen "C" and that his prior description of him was wrong, as the man had a darker complexion and was

taller than he initially thought.  Green told Nowak that his height was in fact 6 feet 2 inches.  At trial, Green attributed his mistake to the fact that the night of the incident he was sitting in the car while defendant stood, so that he had no frame of reference.

While on patrol on May 3, 2011, Officer Michael Igualdo saw a man matching the description of the suspect from the April 15 shooting.  This individual was a Black male, "tall, slim build, and young," and he was wearing a red cap.[2]  Igualdo stopped the man, who identified himself as defendant.  Later that day Igualdo went back to the 1400 block of 77th Avenue and observed defendant leaning against a grey sedan parked in close proximity to the 1406 77th Avenue apartment building.

On May 9, Nowak went to Green's residence and showed Green two new photo lineups. Green immediately identified photograph No. 4 as the person he knew as "C."  At trial, Nowak testified that defendant is the person shown in photograph No. 4.  Based on this information, an arrest warrant was issued and defendant was arrested on May 20, 2011.

Forensic pathologist and criminalist testimony

A forensic pathologist testified that the victim had a grazing gunshot wound to the left shoulder.  There was "an entrance-type gunshot wound, entrance meaning bullet going into the body.  And this was located in the area of the left collar bone.  There were also some scrapes on [the victim's] body, and these were located at . . . the right eye area."  The pathologist said that the scrapes were consistent with being punched with a fist, although he could not confirm that was in fact the cause.  The cause of death was a gunshot wound to the torso.

A criminalist with the Oakland Police Department also testified.  He tested the victim's sweatshirt, focusing particularly on the upper left-hand shoulder area and what looked like a bullet hole.  By examining the hole, the lead surrounding the hole, and residue gun powder left on the sweatshirt, the criminalist found that the hole was ragged and torn, indicating a "close, near contact or contact shot" and that the hole is a bullet hole made from sweatshirt-to-muzzle distance.

Defendant's alibi

Laura Richardson testified that she and defendant were friends and were also intimate.  She testified that she was with defendant on April 14, 2011, recording a video in the park.  Richardson said they went to the home of defendant's grandmother 'late' that night, and stayed for four to six hours.  She and defendant left his grandmother's house around the break of dawn the following morning, April 15, to get breakfast and she then dropped defendant off back at his grandmother's home.  Richardson said she specifically remembered April 15th, as it was tax day and her mother "waits to the last day to do taxes"[3] and her son had a performance at school that afternoon.  On cross-examination,

---

[2] "The description of the suspect also included reference to a black jacket."
[3] "A juror pointed out that in 2011, April 15 was a holiday, so the last day to file taxes was the 18th."

Richardson testified that when she visited him in jail "[defendant] did tell [her] that he was with [her] on the day that it was alleged that it happened, but . . . [i]t was not the main point of [their] conversation, and he did not sound nervous . . . ."[4]  Richardson testified that she never thought to go to the police with the exculpatory information.

Defendant testified and denied any association with the victim, Green, Smith, or the nickname C.  He testified that he had only limited contact with the 77th Avenue apartment building, but he also acknowledged that he sold marijuana at the apartment complex throughout 2010 and that he previously told Nowak that the apartment "was [his] house growing up."  He testified that he stayed in the apartment when he needed money and that the apartment building appeared in his first rap music video.[5]

Defendant testified he was at his grandmother's house on April 15, 2011, at 3:30 a.m.  He acknowledged, however, that when arrested he had told Officer Nowak something different.  He had first told Nowak that he was at his father's house on April 15th.  At trial he explained that he was there later in the day, around 11:00 a.m. for "only 15, 20 minutes" and that the "[the police officers] never made it specific on the time" and he thought they were referring to later in the day, and not 3:45 a.m.  Nevertheless, defendant testified he was "deliberately lying to the police when [he] told them [he was] at [his] dad's house" and that even if the police officers had been specific as to the time of day, he "probably would have still lied because [he] knew [he] didn't know nothing about a murder."  Later, defendant gave Nowak a second alibi, that he was in custody in San Jose from April 14 to April 16, 2011 and at trial admitted that this alibi was also untrue.[6]  Although having testified that April 15 was an important and memorable date for his family, he testified that his mind was racing during his interview with Nowak and he mixed up the dates.  He was not arrested until the night of April 15.

Defendant testified that he had not previously told the police he was at his grandmother's home at 3:30 a.m. on April 15 because he did not want to involve his grandmother in a criminal investigation and for that reason had lied to the police officers.

Uncharged offense admitted to prove intent and absence of mistake or accident

Prior to the jury being empanelled, the court ruled on motions in limine,

---

[4] "Richardson testified that the main reason for visiting defendant in jail was to tell him that she was pregnant.  She was positive defendant was the father, but she later suffered a miscarriage."
[5] "This music video was entitled 'Get that Dough.'  During cross-examination, the prosecutor asked defendant about the video's message, and defendant said the song is about how 'I want to get money.'  The prosecutor then asked defendant if there were guns in the video, and defendant said 'there is not a gun in that video.'  The video was played during trial, and guns were in fact featured throughout the video."
[6] "Defendant testified that he left his grandmother's house for his father's house around 10:00 a.m. on April 15.  After picking up two prostitutes and stopping quickly at his father's house, defendant said he went to San Jose to drop off one of the prostitutes.  Defendant got into an altercation with a woman, who stabbed him in the forehead, but defendant was arrested.  Defendant said he was released the following afternoon, April 16, in San Jose."

United States District Court
Northern District of California

including the People's motion "to admit evidence under [Evidence Code section] 1101(b) regarding [defendant's] conduct that occurred on March 22nd of 2009." The prosecutor offered to prove that on the prior occasion defendant shot another man who he claimed owed him money, but that an attempted murder charge was dismissed when the victim refused to identify defendant at the preliminary hearing. This evidence was "solely offered to establish intent and the absence of mistake or accident in this case." The prosecutor argued that the two incidents were "very similar in terms of the claim of rights. And even right down to the confrontation with the victim that starts with a physical confrontation and ends with a shooting." Defendant objected, arguing that the two incidents differed in motive and plan, and that evidence of the uncharged offense was of limited probative value and would be extremely prejudicial. He argued, "I think that the . . . defense in the case is going to be misidentification and alibi," and although "technically all the elements may be an issue . . . it seems pretty clear to me that from the discovery and the preliminary examination testimony that whoever [Green] sees, whoever he may be . . . probably committed the murder, that shooting somebody with a high caliber weapon in close range like that, . . . it doesn't leave much room to argue things like intent or mistake . . . [t]he court's decision should be made in relation to that given that the defense is not seriously going to contest what was the intent of the shooter."

The trial court ruled that evidence of the uncharged offense would be admitted because the evidence was "materially and substantially probative . . . to prove intent." The court explained, "It is the 2009 incident in San Francisco and the one here in Oakland alleged in this complaint. There are similarities, the least of which would be that I hit people and then I shoot them, and that's what I do. The bottom line, also, when you add to that similarity factor, is that defendant . . . alleged that the victim owed him money in the March '09 incident versus this one where it is alleged that he had his iPod." "The factors are certainly consistent and great between the two instances that would allow [the court] to conclude it is material, it is substantially probative and therefore should be allowed." With respect to Evidence Code section 352, the court considered the evidence to have more probative value than prejudicial effect. The court stated that the 2009 incident was "highly probative, highly relevant, highly material as it relates to intent and to show the absence of mistake." The evidence would not be unduly time-consuming or prejudicial because "[i]t would not take that much time, certainly, to have the witnesses brought forth from the '09 incident to testify, and it wouldn't confuse the jury because the instructions are very clear that they can only use it for certain matters and not for others."

Thus, at trial, Parree Foster was permitted to testify regarding the events of March 2, 2009. He told the jury that he sold drugs in downtown San Francisco for several dealers, including defendant. On this particular day, he owed defendant $15. At 8:00 p.m. on March 2, defendant approached Foster and said "you owe me some money." Foster told defendant he would get the money to him soon, but defendant hit Foster in the ear. Foster responded by striking defendant. Defendant walked away but soon returned. As he approached Foster, defendant said, "Oh, you owe me some money; you deserve that, huh?" Defendant then reached into his pocket, walked into Foster, and shot Foster three times in the abdomen and once in the leg. When the police arrived and Officer

Jason Robinson was collecting gun powder residue from defendant, Robinson testified that defendant stated: "I'm not going to lie, Officer. I ran up on the guy because he owed me some money. I heard shots. I'm from Oakland. I came out here to get my money." Defendant was charged with attempted murder of Foster and possession of a controlled substance. At the preliminary hearing, Foster denied knowing defendant or that he was involved in the shooting and the attempted murder charge was dropped. During his testimony in the present trial, defendant offered a different account of the 2009 incident. He testified that he went to San Francisco to confront Foster about a debt he owed a friend. He admitted jumping Foster with four other men, but claimed that someone else shot Foster. He told defense counsel that he found himself taking the rap for another individual.

*People v. Smith*, 2013 WL 4017400, at *1-*5.

## B.   Post-Conviction Evidentiary Hearing

As alluded to above, the California Court of Appeal remanded Petitioner's first state habeas petition to the Superior Court to consider Petitioner's claim of actual innocence based on newly discovered evidence. On February 27, 28, and March 1, 2017, the Superior Court held an evidentiary hearing on that claim. *See* ECF 18-17 (Reporter's Transcript of evidentiary hearing). The Superior Court's opinion summarized the evidence presented as follows:

Petitioner asserted four claims of new evidence in his Petition. First, is the testimony of Patrick Smith, who acknowledged that he was driving the car that was involved in the incident and that he witnessed the shooting by a man he knew as "C" and that Petitioner is not that man. Second, is the affidavit of Yolanda Washington in which she states that she was present in the apartment when "C" left to pursue the victim and that "C" is Charles Lynn Dunn, Jr., not Petitioner. Third, are Petitioner's cell phone records indicating that Petitioner was not speaking on his cellphone at a point before the killing when Robert Green testified the person who shot the victim was speaking on his cell phone. Last is the "enhanced video" which assertedly shows details of Green's testimony were incorrect. As stated on the record, this Court finds that only the testimony of Patrick Smith qualifies as new evidence, since he was a co-participant in the incident and was cloaked with the protection of the Fifth Amendment privilege as his case had not yet been resolved at the time of Petitioner's trial.

Once the threshold of new evidence raises doubt about the defendant's guilt, then the court can consider evidence that does not technically qualify as newly discovered. (*In re Hall* (1981) 30 Cal. 3d 408.) The Court found that Ms. Washington's testimony, Petitioner's cellphone records and the "enhanced video" were not newly discovered; however the Court nevertheless agreed to consider any testimony or evidence at the hearing under the reasoning of *Hall*.

However, Petitioner's efforts to subpoena Ms. Washington eventually failed, despite the Court granting three motions to continue to facilitate locating her, over a span of almost five months. The Court also denied Petitioner's motion

to consider Ms. Washington's out of court hearsay statement.  Consequentially,
the only evidence considered at this hearing was: 1) the testimony of Patrick
Smith; 2) the "enhanced video," and 3) Petitioner's cell phone records.

ECF 18-17 at 355-56 (Sup. Ct. opinion in Case No. 166345 at 10-11).  In addition, the Superior

Court "listened to and observed the testimony of Deputy District Attorney Gregory Dolge and

Theodore 'Ted' Berry, Patrick Smith's attorney."  *Id.* at 357 (Sup. Ct. opinion in Case No. 166345

at 12).

After reviewing these three pieces of evidence in detail, the Superior Court made the

following findings regarding each:

1)  Patrick Smith's Testimony

[…]

A case is only reversed on a writ of habeas corpus based on new evidence
if that evidence is credible.  The court finds that the testimony of Patrick Smith
was not credible.  The court considered Smith's numerous inconsistent statements,
the admitted discrepancies between his sworn affidavit and his testimony in court,
the fact that he didn't tell his own attorney that Petitioner wasn't the shooter, his
potential bias, his demeanor, and his felony convictions of moral turpitude.  The
court considered that Smith only changed his testimony once his case was
resolved. The court considered that he refused to identify the person he claimed
was the "real shooter".  Hence, counsel was unable to probe and investigate his
claim.

Smith's testimony was not of such decisive force and value that it would
have more likely than not changed the outcome at trial.  It was not credible, but
the trial testimony of Robert Green was.  Petitioner testified in his own defense
and it was pointed out that he lied to the police and, like Smith, told three
different versions of events. Patrick Smith's testimony was incredible, and the
evidence at trial was convincing.  The court finds that it his testimony does not
meet the necessary grounds for relief.

2)  "Enhanced" Video

The court viewed and considered the "enhanced" video clip presented by
Petitioner.  As stated previously, the Court found that this video was not new
evidence; the original video was provided to counsel before trial and was played
at trial.  By stipulation, counsel agreed that the technology used to "enhance" it
was available before trial.  The Court, however, considered the video evidence
alongside Patrick Smith's testimony under the Hall decision.  The Court reviewed
the original video shown to the jury at trial, and viewed the portion of that video
side by side with the "enhanced" clip.  The Court finds that there is no significant
difference between the two.  The "enhanced" version does not assist the Court in
further identifying the shooter nor does it shed any new light on where various
people were standing.  To the extent that there were discrepancies, if any, between

the video and Robert Green's testimony, those discrepancies existed in the original video viewed by the jury and admitted at trial. The "enhanced" video did not corroborate Patrick Smith's testimony any more than the original video would have. The court finds the "enhanced" video presentation insignificant in making a decision about new evidence.

### 3)  Cell Phone Records

The Court viewed and considered the phone records presented by both counsel. The Court not only considered the records attached to the original habeas petition, but also considered all the phone records marked and admitted as evidence by both counsel at the hearing. The court further reviewed and considered the stipulations entered into by counsel. As stated previously, the court found that these records were not new evidence as they were provided to defense counsel before the time of trial. The court did, however, consider the records alongside Patrick Smith's testimony under the *Hall* decision.

The court finds the phone records to be insignificant in supporting Petitioner's claim of innocence. The phone records, viewed with the trial testimony, show the following facts. First, Petitioner did not make or receive a call on (408) 520-6285 or (925) 206-1491 in the minutes directly before the murder. Second, those two phone numbers are associated with Petitioner. Third, Robert Green testified at trial that "C", whom he identified as Petitioner, was on the phone while in the car on the way to hunt down Dawonye Taylor. The Court does not draw significant implications from these facts. Even assuming Robert Green was correct that he heard "C" talking on the phone, Petitioner could have borrowed a phone or used another phone.[7] It is also possible Green was innocently mistaken and saw Rushing holding a phone and talking, but not talking on it.[8]

Lastly, the cellphone tower records do not even appear to support Petitioner's trial testimony as to where he was before and after the murder. Petitioner said he was at his grandmother's house located at 78th and Holly on April 14th from 10 p.m. until the morning of April 15th, however the (408) 520-6285 phone was "pinging" on a cell tower on Foothill Boulevard at 11:51 p.m.

The phone records provide little relevant information. They only indicate, at best, that Petitioner was not making or receiving calls on two numbers associated with him in the minutes before the murder. This fact is not meaningful.

*Id.* at 366-69 (Sup. Ct. opinion in Case No. 166345 at 21-24).

The Superior Court then denied the petition's request for relief, finding that California

Penal Code § 1473(b)(3) had not been satisfied.:

---

[7] "The (408) number appeared to be shut off in the hours before the murder and the (925) number did not ever appear to be used for communication."

[8] "Pat Smith did not have any memory of either C or Dre being on the phone."

1
2
3
4
5

The Petition is denied.  The Court has applied the new standard for petitions for writs of habeas corpus based on newly discovered evidence under Penal Code section 1473(b)(3.)  The testimony of Patrick Smith was not credible, whereas the testimony of Greg Dolge and Ted Berry were credible. Further, Patrick Smith's testimony, the enhanced video and the phone records lack such decisive force and value that it would have more likely than not changed the outcome at trial.  This Court which was the trial judge makes this finding in light of the other evidence presented at trial, excluding from its calculus the testimony of Paree Foster which the Court of Appeal ruled was erroneously admitted at trial.

6

*Id.* at 369 (Sup. Ct. opinion in Case No. 166345 at 24).

7

### III.   LEGAL STANDARD

8

A federal court may entertain a habeas petition from a state prisoner "only on the ground

9

that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

10

U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district

11

court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in

12

a decision that was contrary to, or involved an unreasonable application of, clearly established

13

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

14

that was based on an unreasonable determination of the facts in light of the evidence presented in

15

the State court proceeding."  *Id*. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In

16

addition, the federal habeas court must presume correct any determination of a factual issue made

17

by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing

18

evidence.  28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).

19

When there is no reasoned opinion from the highest state court to consider the petitioner's claims,

20

the court looks to the last reasoned opinion of the highest court to analyze whether the state

21

judgment was erroneous under the standard of § 2254(d).  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-

22

06 (1991).

23

The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses.

24

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives

25

at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the

26

state court decides a case differently than th[e] Court has on a set of materially indistinguishable

27

facts."  *Williams*, 529 U.S. at 412-13.  "Under the 'unreasonable application' clause, a federal

28

habeas court may grant the writ if the state court identifies the correct governing legal principle

United States District Court
Northern District of California

11

from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (not dicta) existing at the time of the relevant state court decision, because only the Supreme Court's holdings are binding on the state courts. *See Williams*, 529 U.S. at 412.  Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, the AEDPA sets forth a highly deferential standard for evaluating state court rulings: It requires a state prisoner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear.  "[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala,* 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197-98 (internal quotations omitted).

With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

12

IV.    **CLAIMS**

In his Amended Petition, Petitioner asserts the following eight claims for relief:

1. Petitioner was denied his Fourteenth Amendment right to Due Process when the state court found that the erroneous admission of highly prejudicial other crimes evidence was harmless.

2. Petitioner was denied his Fifth and Fourteenth Amendment rights to Due Process when the trial court allowed the jury to use other crimes evidence in determining whether petitioner was credible and allowed the jury to find petitioner's guilt by a preponderance of the evidence.

3. Petitioner was denied his Sixth Amendment right to present a defense and Fourteenth Amendment right to Due Process when the trial court refused to let hm testify regarding the identity of C.

4. Trial counsel was ineffective in violation of petitioner's Sixth Amendment right to counsel when counsel failed to make an offer of proof as to petitioner's identification of C.

5. Petitioner was denied his Sixth and Fourteenth Amendment Due Process right to a fair trial and his conviction should be vacated on the grounds of newly discovered eyewitness evidence which more likely than not would have resulted in a different outcome had it been presented at trial.

6. Petitioner was denied his Fourteenth Amendment right to Due Process when the superior court found that Washington's declaration was not new evidence and refused to consider whether Washington's testimony would have more likely than not changed the outcome at trial.

7. Petitioner was denied his Fifth and Fourteenth Amendment rights to Due Process when the prosecution failed to provide exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

8. The cumulative effect of multiple errors denied petitioner his Fourteenth Amendment right to Due Process.

Pet. at p-11 to p-12.  The Court assesses these claims *seriatim*.  As to each, the Court considers whether there has been a constitutional violation and if so, whether any error was harmless.

### A.    Claim 1: Due Process Violation Based on Admission of Prior Bad Act

At trial, the Superior Court admitted evidence of a prior bad act pursuant to California Evidence Code § 1101(b) to prove intent and lack of mistake.  That evidence concerned an incident in 2009 for which Petitioner was charged with attempted murder and assault with a deadly weapon of an individual named Paree Foster; those initial charges were ultimately dismissed and Petitioner pled guilty to a simple drug offense.  Petitioner believes the trial court erred by admitting the evidence because its probative value was substantially outweighed by the risk of prejudice, which is improper under California Evidence Code § 352.  *See* Pet. at m-2.

When the California Court of Appeal considered this claim on direct appeal, it held that the trial court's admission of the prior incident was error under California Evidence Code § 352, but that the error was harmless.  As laid out above, the California Supreme Court then summarily denied Petitioner's request for review of the direct appeal (Case No. S212883).

Petitioner's first claim for habeas relief is that the California Court of Appeal erred in deeming the trial court's evidentiary error harmless.  The parties agree that the California Court of Appeal's decision on direct appeal is the "last explained state-court judgment," *Ylst*, 501 U.S. at 801-06, on Petitioner's Claim 1.  *People v. Smith*, 2013 WL 4017400, at *6-*8.  Accordingly, this Court now reviews that decision.

### i.    State Court Decision

As just noted, the California Court of Appeal agreed with Petitioner that the trial court erred in admitting evidence of the 2009 incident:

> We agree with the trial court that there was sufficient similarity between the charged and uncharged acts to make evidence of the prior shooting relevant to prove intent and absence of accident or mistake.  However, because these factors were undisputed—the only disputed issue being the identity of the shooter—the evidence should have been excluded as having little probative value and being highly prejudicial.

*People v. Smith*, 2013 WL 4017400, at *6.  First, the Court explained that evidence of the 2009 incident was admissible under California Evidence Code § 1101(b) to show intent:

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

The trial court did not abuse its discretion in finding that the 2009 act and the charged act were sufficiently similar to prove intent and absence of mistake or accident.  The court described the 2009 incident with Foster as "the defendant confronted Mr. Foster . . . , alleging that [Foster] owed him money, that [defendant] then struck [Foster] first and then he shot [Foster]."  The judge summarized the present act as "[defendant] confronted [the victim], [who] allegedly . . . [took] his iPod, . . . and then [defendant] hit [the victim] first and then he shot [the victim] . . . just from looking at the two [acts], . . . he confronted [the victim], he alleged he owed, he beat him up, and then he shot him."  For the limited purpose of proving intent, this was sufficient.  (See *People v. Walker* (2006) 139 Cal. App. 4th 782, 804 [evidence that both victims were beaten in the face, resulting in bruising around the eyes, indicated a similarity between the two acts]; *People v. Roldan* (2005) 35 Cal. 4th 646, 706, overruled on other grounds in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22 [concealed weapon indicates commonality between two acts].)  " '[W]hen the other crime evidence is admitted solely for its relevance to the defendant's intent, a distinctive similarity between the two crimes is often unnecessary for the other crime to be relevant.  Rather, if the other crime sheds great light on the defendant's intent at the time he committed that offense it may lead to a logical inference of his intent at the time he committed the charged offense if the circumstances of the two crimes are substantially similar even though not distinctive.' "  (*People v. Demetrulias* (2006) 39 Cal. 4th 1, 16–17.)  The same is true with respect to the absence of mistake or accident.  Intent and absence of mistake or accident "[reflect] two ways of describing the same relevant issue, namely, that defendant performed the acts that killed [the victim] intentionally rather than accidentally."  (*People v. Whisenhunt* (2008) 44 Cal. 4th 174, 204.)

16

*Id*. at *6 (alterations in original).

17

18

19

Then, as to the latter finding—that the evidence should have been excluded under

California Evidence Code § 352 as "having little probative value and being highly prejudicial"—

the Court of Appeal explained:

20
21
22
23
24
25

Nonetheless, in admitting the evidence, there was an unmistakable danger that the jury would improperly consider the evidence to show defendant's disposition to shoot others, supporting Green's testimony that defendant is the person who committed the murder in this case.  "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citation.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have substantial probative value.' "  (*People v. Ewoldt, supra*,7 Cal. 4th at p. 404; *People v. Hendrix* (2013) 214 Cal. App. 4th 216, 245.)

26
27
28

The probative value of the evidence concerning the 2009 shooting was minimal at most in this case.  The defense was not that defendant did not intend to shoot Taylor, or that he accidentally did so, but that he was not the person who did the shooting.  It is true, as the Attorney General argues, that a "[d]efendant's plea of not guilty put in issue all of the elements of the offenses, including his

intent." (*People v. Balcom* (1994) 7 Cal. 4th 414, 422–423.)  Nonetheless, there are circumstances in which "if the jury found that defendant committed the act alleged, there could be no reasonable dispute that he harbored the requisite criminal intent." (*Id.* at p. 422.)  In such situations, "evidence of defendant's uncharged similar offenses [to prove intent] would be merely cumulative on this issue" and "the limited probative value of the evidence of uncharged offenses, to prove intent, is outweighed by the substantial prejudicial effect of such evidence." (Id. at p. 423.)  In such cases, there is "no need for the jury to hear inherently prejudicial other crimes evidence that evinced a propensity of violence." (*People v. Hendrix*, *supra*, 214 Cal. App. 4th at p. 245.)

In *Balcom*, the evidence was that the defendant placed a gun at the victim's head, which was sufficiently compelling evidence of the defendant's intent, if believed, to render evidence of an uncharged similar offense unnecessary to prove intent, and the value of the evidence for that purpose was outweighed by its substantial prejudicial effect.  Precisely the same is true in the present case.  The only evidence was that the shooter, standing next to Taylor, fired a single shot at his stomach and that Taylor died from a single "close, near contact or contact [gun]shot."  The criminalist testified that the shot was "sweatshirt-to-muzzle distance."  Green saw defendant within seconds after the shooting, aiming the gun at the victim's stomach, with his finger still on the trigger.  As defense counsel put it in objecting to the admission of the other-crime evidence, there was not "much room to argue things like intent or mistake."  Unlike the situation in *Whisenhunt*, where the defense offered evidence that the victim's injuries were inflicted accidentally (*People v. Whisenhunt*, *supra*, 44 Cal. 4th at p. 204), the defense here consistently argued that its defense was that the prosecutor was charging the wrong person.  Defense counsel made this clear in opposing the prosecution's in limine motion and his opening statement to the jury began: "In this case I expect the evidence will not prove beyond a reasonable doubt that [defendant] was the shooter who caused the death of Mr. Taylor on April 15th this year."  These facts presented the strongest case for exclusion of the evidence of other crimes: "(1) the defendant has not affirmatively claimed accident and (2) the nature of the crime is such that accident would not be a plausible defense."  (1 Edward J. Imwinkelried, Uncharged Misconduct Evidence (2009) Use of Uncharged Misconduct To Prove Elements of Mens Rea—Disproving Defendant's Claim That He or She Acted Accidentally, § 5:11, p. 40.)

*Id.* at *6-*7.

Thus, the Court of Appeal found that although the 2009 incident was admissible to prove intent and absence of accident or mistake, there was a substantial risk of the jury improperly treating the incident as propensity evidence.  The Court of Appeal further found that such risk was not justified by the probative value of the evidence because the issues of intent and absence of accident or mistake were not actually in dispute at trial.  The court therefore held that the trial court erred in admitting testimony concerning the 2009 incident.

United States District Court
Northern District of California

16

The Court of Appeal then determined, however, that the trial court's error was not prejudicial—i.e., the outcome of the trial would not have been different:

> Although we conclude that the trial court erred in admitting testimony concerning the 2009 shooting, whether this error was prejudicial presents a close question.  The error was harmless if it is not reasonably probable that defendant would have received a better outcome had the evidence been excluded. (*People v. Watson* (1956) 46 Cal. 2d 818, 836.)  "We will only disturb the trial court's exercise of discretion under section 352 'when the prejudicial effect of the evidence clearly outweighed its probative value.' "  (*People v. Hollie* (2010) 180 Cal. App. 4th 1262, 1274.)

> Defendant was identified as the shooter by only a single witness, Green, who was then on felony probation and actively used drugs.  There was no tangible evidence linking defendant to the killing.  Although several fingerprints were recovered from the vehicle in which the shooter was riding, none were those of defendant.  Moreover, Green's initial description of "C" was inaccurate, albeit in relatively minor respects.

> Nonetheless, Green declined to make an identification of the shooter when defendant's photograph was not included in the several photo lineups initially shown to him.  However, when he fortuitously encountered defendant at a BART station, he immediately recognized him.  When first presented with a collection of photos that included defendant's photograph, he instantly and unequivocally identified defendant.  Green had seen defendant on prior occasions and had no apparent reason to falsely accuse him.  And there were other corroborating circumstances.  The testimony of Carla Smith and a video surveillance tape confirmed Green's version of the shooting.  Although neither Carla nor the video tape identified the shooter, both support the reliability of Green's testimony.  Green's identification of defendant was also confirmed by his testimony that he had previously seen the person he knew as "C" driving in a grey sedan, in combination with Officer Igualdo's testimony that he had observed defendant leaning on a grey sedan near the 77th Avenue apartment building.  Indeed, the evidence linking defendant with the sale of drugs at the apartment building from which the killer and the victim emerged also tends to confirm the reliability of Green's identification.

> Perhaps the most persuasive support of Green's testimony is defendant's acknowledgement that he gave the police two false accounts of his whereabouts at the time of the killing, before providing a third alibi for the first time at trial.  Moreover, his single supporting alibi witness, Laura Richardson, professed confidence in her recollection of events on April 15 because that was supposedly the final day for paying taxes, when the final date in 2011 was in fact April 18.  Still further, Richardson admitted that when she visited defendant in jail he told her that they were together on April 15.  And defendant admitted that even if he had not been confused in his initial accounts to the police, he would have lied because "he didn't know nothing about a murder."  Taken together, defendant's repeated lies about his whereabouts strongly suggest a consciousness of guilt (see *People v. Maury* (2003) 30 Cal. 4th 342, 399 [jury could reasonably infer that

defendant's lies to the police reveal a consciousness of guilt]; CALJIC No. 2.03) and support the veracity of Green's testimony identifying him as the person who shot Taylor.

Considering the record as a whole, we conclude that the other evidence of defendant's guilt was sufficiently strong that exclusion of the 2009 act would not have produced a different outcome.  (See *People v. Williams* (2009) 170 Cal. App. 4th 587, 613.)  Moreover, other factors that the court is to consider in evaluating potential prejudice also mitigate against such a finding.  The amount of testimony concerning the uncharged act was not disproportionate to the volume of testimony devoted to the charged act, which minimizes possible prejudicial effects.  (See *People v. Avitia* (2005) 127 Cal. App. 4th 185, 194; 2 Imwinkelried, Uncharged Misconduct Evidence (2009) Direct appeal—Reversibility of error— Factors considered in deciding whether error was harmful, § 9:87, p. 282.)[9]  The testimony describing defendant's uncharged acts was "no stronger and no more inflammatory than the testimony concerning the charged offenses."  (*People v. Ewoldt*, *supra*, 7 Cal. 4th at p. 405.)  Furthermore, the court provided limiting instructions throughout the proceedings.  (*People v. Scheer* (1998) 68 Cal. App. 4th 1009, 1023 [limiting instruction inform the jury that it cannot consider the evidence for propensity purposes].)  The court gave a limiting instruction before each witness who testified regarding the 2009 incident and reiterated the limiting instruction in the jury instructions at the close of the evidence.  Given the number of instructions that were given and the clarity of the instruction, we must presume that the jury adhered to the admonitions.  (*Ibid.*)

*Id.* at *7-*8.

### ii.   Discussion

In his Claim 1, Petitioner contends that the Court of Appeal erred in finding the trial court's evidentiary error under California Evidence Code § 352 to be harmless.  *See* Pet. at m-3 to m-7.  He asserts there was a great risk of prejudice in the evidence of the 2009 shooting, as "there was a serious risk that the jury would use this evidence to find criminal propensity."  *Id.* at m-4.

As a threshold matter, however, a violation of state evidence law is not a basis for federal habeas relief.  "A federal habeas court, of course, cannot review questions of state evidence law"; it can only consider whether a petitioner's conviction violated federal law.  *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Hence,

---

[9] "While 13 witnesses testified regarding the charged offense, the prosecution called only three witnesses, Foster and two responding officers, to recount the events of March 2, 2009.  In a trial that lasted nine days, with witness testimony on seven of those days, the testimony of these witnesses was not disproportionately time consuming.  Foster's testimony took a portion of a single afternoon session and the two officers both testified within a single morning session."

United States District Court
Northern District of California

1  even the erroneous admission of evidence is not subject to federal habeas review unless "a specific

2  federal constitutional or statutory provision" is violated or the error is of such magnitude that it

3  "deprive[s] the defendant of the fundamentally fair trial guaranteed by due process."  *Ruby v. Roe*,

4  86 Fed. App'x 289, 290 (9th Cir. 2004) (quoting *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.

5  1995)); *see also Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) ("[W]e have long recognized that a

6  mere error of state law is not a denial of due process.").

7          Petitioner acknowledges that the U.S. Supreme Court "has not yet made a clear ruling that

8  admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

9  sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.

10  2009); *see* ECF 26-1 ("Reply") at 1.  That is, the U.S. Supreme Court has "expressly reserved" the

11  question of whether the use of prior bad acts to show a defendant's propensity to commit a

12  charged crime can violate due process.  *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)

13  (citing *Estelle*, 502 U.S. at 75 n.5).  Petitioner therefore cannot show that introducing propensity

14  evidence violated a specific federal constitutional provision under clearly established U.S.

15  Supreme Court precedent.  *See id.* ("Our precedent squarely forecloses this argument."); *see also*

16  *Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006).

17          Petitioner instead argues that the admission of propensity evidence under the facts of this

18  case was so prejudicial that it denied him a fair trial.  *See* Pet. at m-4; Reply at 2.  For the ensuing

19  reasons, however, Petitioner's attempt to elevate an error under state evidence law to a violation of

20  due process is unavailing.

21          The Ninth Circuit has said admission of evidence renders a trial fundamentally unfair in

22  violation of due process only if the petitioner meets the "heavy burden" of showing there are "no

23  permissible inferences" the jury could draw from the challenged evidence.  *Boyde v. Brown*, 404

24  F.3d 1159, 1162 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005); *accord*

25  *Heartsman v. Arnold*, No. 16-CV-06098-VC (PR), 2018 WL 888270, at *6 (N.D. Cal. Feb. 14,

26  2018), *aff'd*, 780 Fed. App'x 534 (9th Cir. 2019).  "Even then, the evidence must 'be of such

27  quality as necessarily prevents a fair trial.'"  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

28  1991).

United States District Court
Northern District of California

In this case, the Court of Appeal affirmed the trial court's finding that the 2009 shooting was relevant to show Petitioner's intent and lack of mistake in committing the killing of Dawonye Taylor. *See People v. Smith*, 2013 WL 4017400, at *6. Petitioner does not currently challenge this finding, which the Court agrees is reasonable. It is true, as Petitioner emphasizes, that the Court of Appeal ultimately found the prejudicial effect of the evidence to outweigh its probative value, as matter of state evidence law. But the result of that balancing does not negate the permissible inferences the jury could draw—i.e., that Petitioner had the requisite intent to kill the victim. *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993), *as amended* (June 10, 1993) ("Although this evidence may have been more prejudicial than probative and, thus, inadmissible under California evidence law, this court is only concerned with its relevance."). Though intent may not have been a central issue at trial, the U.S. Supreme Court has made clear that due process does not require "the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point." *Estelle v. McGuire*, 502 U.S. at 70; *accord Jones v. Soto*, No. 15-CV-01883-EMC, 2016 WL 3548371, at *9 (N.D. Cal. June 30, 2016).

"Because the jury could draw a permissible inference from evidence of [the 2009 shooting], admission of that evidence did not violate due process, so long as the jury was instructed that it could not draw any improper inferences from it." *Boyde*, 404 F.3d at 1173. Here, as the Court of Appeal reported, the trial court "gave a limiting instruction before each witness who testified regarding the 2009 incident and reiterated the limiting instruction in the jury instructions at the close of the evidence." *People v. Smith*, 2013 WL 4017400, at *8. Those instructions advised the jury that "the sole reason that you may consider the evidence or testimony of the next witness is to prove intent or to prove the absence of mistake or accident; the trial court further emphasized that the jury "may not consider the testimony" of the relevant witnesses "for any other purpose." ECF 18-12 at 97-98, 175, 162; ECF 18-14 at 148 (Reporter's Transcript at 871-72, 936, 949, 1306). The Court presumes, as it must, that the jury followed the trial court's instructions. *See Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987).

Moreover, even if the jury could draw no permissible inferences from the evidence at issue, it still must be "of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at

920.  The Ninth Circuit's past applications of this standard make clear that it is satisfied only by evidence of a "highly inflammatory or emotionally charged quality."  *Ilyin v. Ramirez-Palmer*, No. C02-2066CRB(PR), 2003 WL 21838535, at *5 (N.D. Cal. Aug. 4, 2003); *see also Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006).  Here, the Court agrees with the Court of Appeal that the testimony describing the nonfatal 2009 shooting "was no stronger and no more inflammatory than the testimony concerning the charged offense[]" of first degree murder, *People v. Smith*, 2013 WL 4017400, at *8.  *See Jones v. Soto*, No. 15-CV-01883-EMC, 2016 WL 3548371, at *10 (N.D. Cal. June 30, 2016); *Ilyin v. Ramirez-Palmer*, 2003 WL 21838535, at *5.  This is a second, independent reason why admission of evidence regarding the 2009 incident does not rise to the level of a due process violation.

Thus, because the evidence about the 2009 incident was not of a quality that necessarily prevents a fair trial and could give rise to permissible inferences, the Court concludes its admission did not violate Petitioner's right to due process.

In his petition, Petitioner also argues at length that the trial court's admission of evidence of the 2009 shooting was not harmless, contrary to the Court of Appeal's finding.  However, because this Court holds that the asserted evidentiary error did not amount to a constitutional violation, the question of whether that error was harmless is moot.  The Court simply observes that, in applying the harmless error standard from *People v. Watson*, 46 Cal. 2d 818 (1956) rather than the standard from *Chapman v. California*, 386 U.S. 18, 23–24 (1967), the Court of Appeal "impliedly found" that the trial court's error was not "of constitutional magnitude."  *Bains v. Cambra*, 204 F.3d 964, 971 (9th Cir. 2000); *accord Estrada v. McDowell*, No. 16-CV-02827-YGR (PR), 2017 WL 5068641, at *27 (N.D. Cal. Nov. 3, 2017).

The Court rejects Petitioner's claim of constitutional error in Claim 1; his request for habeas relief is therefore DENIED.

### B.    Claim 2: Due Process Violations Based on Jury Instruction Permitting the Jury to Consider Prior Bad Act in Assessing Petitioner's Credibility

Claim 2 is also related to the evidence concerning the 2009 shooting.  The trial court instructed the jury that the 2009 shooting, if proved by a preponderance of the evidence, could also

United States District Court
Northern District of California

be considered in determining Petitioner's credibility.  Petitioner asserts two errors in the trial court's instructions: (1) that the jury should not have been permitted to use the 2009 incident to determine Petitioner's credibility, and (2) that the preponderance instruction "improperly undermined the jury's responsibility to find ultimate facts beyond a reasonable doubt."  Pet. at m-9 to m-11.

Petitioner made these arguments on direct appeal before the California Court of Appeal, which held that the trial court's instruction was proper.  As with Claim 1, the California Supreme Court summarily denied Petitioner's request for review of the direct appeal (Case No. S212883). Reviewing the Court of Appeal's decision, the Court finds no violation or unreasonable application of clearly established federal law.

### i.   State Court Decision

Per the California Court of Appeal's opinion, the trial court instructed the jury at the close of trial as follows:

> The People presented evidence that the defendant committed another offense that was not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense. Proof by the preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by the preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with malice aforethought in this case; or [¶] The defendant's alleged actions were the result of mistake or accident. [¶] In evaluating this evidence consider the similarity or lack of similarity between the uncharged offense and the charged offense. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from [this] evidence that the defendant has a bad character or is disposed to commit a crime. [¶] And if you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the allegations that the defendant personally used a firearm or personally and intentionally inflicted great bodily injury or death on Dawonye Taylor have been proved. The People must still prove the charge and allegations beyond a reasonable doubt. [¶] Now, prior to the defendant testifying, I instructed you that the testimony of Parree Foster, Sergeant Simon Kim, and Officer Jason Robinson could only be considered by you for the limited purpose of intent or the absence of mistake or accident. The defendant has testified. You may now

consider that evidence for the additional purpose of determining the defendant's credibility.

*People v. Smith*, 2013 WL 4017400, at *9 (alterations in original).  The Court of Appeal went on to affirm the propriety of the trial court's instruction, rejecting the two claims of error Petitioner asserts in his petition:

> Defendant also contends that it was error to instruct that the other-crime evidence could be used to evaluate defendant's credibility.  Defendant is correct that section 1101, subdivision (b), does not authorize the use of uncharged acts for credibility purposes.  But section 1101, subdivision (c), provides that "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."  (See *People v. Millwee* (1998) 18 Cal. 4th 96, 130–131 [section 1101 does not preclude admissibility of evidence to show "implausibility and untruthfulness of defendant's testimony"].)  And section 780 provides, "[e]xcept as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (i) [t]he existence or nonexistence of any fact testified to by him."  "[W]hen a defendant in a criminal prosecution takes the stand and denies his guilt he puts in issue his reputation for truth and honesty and thus subjects himself to the rules for testing credibility."  (*People v. Taylor* (1986) 180 Cal. App. 3d 622, 631.)  The trial court properly found that "[w]hen the defendant got up and took the stand and . . . indicated there was a lack of culpability, he really did blow the door wide open for the testimony to be used for all purposes, particularly credibility."  Indeed, elsewhere in his argument defendant acknowledges that "[i]t was, of course, proper for the jury to rely upon [defendant's] trial testimony regarding the prior San Francisco incident both for impeachment and to determine his credibility."

> Defendant next argues that the instructions regarding the uncharged act allowed the jury "(i) to find the prior true by a preponderance of the evidence—rather than beyond a reasonable doubt—and (ii) then to use the truth of the prior to determine whether or not [defendant] was credible."  "[A] reviewing court must consider the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner."  (*People v. Loy* (2011) 52 Cal. 4th 46, 74.)  Here, the court instructed that if the jury concluded that defendant committed the other offense, "that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder . . . .  The People must still prove the charge and allegations beyond a reasonable doubt."  (Italics added.)  The instructions state repeatedly that the People had the burden of proving every element of the charged offenses beyond a reasonable doubt.  In *People v. Lindberg*, *supra*, 45 Cal. 4th at page 35, our Supreme Court found no error in similar instructions to those given here.  The court found "no reasonable likelihood that the instructions as a whole led the jury to believe that the prosecution was not required to prove all elements . . . beyond a reasonable doubt."  (Ibid.; see also *People v. Loy*, supra, 52 Cal. 4th at p. 75.)  Under the

instructions given here, we similarly conclude that no reasonable jury could believe that the prosecution was not required to prove all elements of the crime beyond a reasonable doubt.

*Id.*

### i.    Discussion

The Court first addresses Petitioner's contention that it was error to instruct his jury that evidence concerning the 2009 shooting could be considered in evaluating his credibility.  This is so, Petitioner says, because California Evidence Code § 1101(c) "explicitly provides that evidence may not be admitted under Evid. Code § 1101 to prove credibility."  Pet. at m-9.

To be precise, however, § 1101(c) merely states, "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."  Appropriately, the Court of Appeal did not ground its decision in § 1101: As Respondent points out, the Court of Appeal found the evidence was properly admitted under California Evidence Code § 780, which provides that "[e]xcept as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [t]he existence or nonexistence of any fact testified to by him."  Indeed, the challenged instruction is consistent with the trial court's (unchallenged) instruction regarding the assessment of witness testimony in general: "If you find that a witness has committed a crime or other misconduct, you may consider that fact in evaluating the credibility of the witness's testimony."  ECF 18-14 at 142 (Reporter's Transcript at 1301).

Petitioner testified at trial.  In so doing, Petitioner put at issue his credibility as a witness. *See People v. Taylor*, 180 Cal. App. 3d 622, 631 (Ct. App. 1986) ("[W]hen a defendant in a criminal section prosecution takes the stand and denies his guilt he puts in issue his reputation for truth and honesty and subjects himself to the rules for testing credibility.").  Prior conduct involving moral turpitude—such as attempted murder, *see People v. Hinton*, 37 Cal. 4th 839, 888 (2006), *as modified* (Apr. 12, 2006)—is admissible to undercut a witness's general credibility and veracity regardless whether it resulted in a felony conviction.  *People v. Clark*, 52 Cal. 4th 856, 931 (2011).  Prior misconduct is also admissible to impeach particular aspects of the witness's

1   testimony.  *See, e.g.*, *People v. Cooks*, 141 Cal. App. 3d 224, 324 (Ct. App. 1983) (prior

2   conviction for possessing a stolen handgun admissible to contradict witness's statement that he

3   had never possessed a gun).  Accordingly, if the jury found that Petitioner shot Foster in 2009 by a

4   preponderance of the evidence, they could use that prior bad act to assess whether his denial of

5   culpability was credible.

6         The Court of Appeal thus properly found that evidence of the 2009 shooting was

7   admissible as to Petitioner's credibility under California Evidence Code § 780, and that the trial

8   court's instruction to that effect was correct.  *People v. Smith*, 2013 WL 4017400, at *9.  As "it is

9   not the province of a federal habeas court to reexamine state-court determinations on state-law

10  questions," this Court has no occasion to revisit the Court of Appeal's conclusion.  *Estelle*, 502

11  U.S. at 67-68; *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("[A] state court has the last

12  word on the interpretation of state law.").

13        In finding that the instruction was not erroneous under California state law, the Court of

14  Appeal implicitly found there was no federal constitutional error.  Petitioner, for his part, does not

15  argue that even if the instruction was proper as a matter of state law, it contravened federal law.

16  Accordingly, the Court sees no ground for federal habeas relief based on the trial court's

17  instruction allowing consideration of the 2009 incident to determine Petitioner's credibility.

18        Petitioner's second claim of instructional error is that "the trial court should not have

19  instructed the jury that they only had to find that the [2009] incident with Foster happened by a

20  'preponderance of the evidence.'"  Reply at 4; *see* Pet. at m-10 to m-12.  In Petitioner's view, this

21  instruction "improperly lessened the prosecution's burden of proving beyond a reasonable doubt

22  the facts necessary to establish each element of a criminal offense."  Pet. at m-10.

23        It is true, of course, that jury instructions that relieve the state of the burden of proving

24  beyond a reasonable doubt every element of the charged offense violate a defendant's right to due

25  process.  *Carella v. California*, 491 U.S. 263, 265 (1989).  Nevertheless, "not every ambiguity,

26  inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."

27  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  "[T]he proper inquiry is not whether the

28  instruction could have been applied in an unconstitutional manner, but whether there is a

United States District Court
Northern District of California

25

reasonable likelihood that the jury did so apply it." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). Moreover, "all challenged instructions must be considered in light of all of the jury instructions and the trial record as a whole." *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir. 2009).

In this case, the challenged instruction is based on California Criminal Jury Instruction ("CALCRIM") 375, "Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.," and was given in connection with the evidence of the 2009 shooting. Petitioner complains that this instruction permitted the jury to consider the 2009 shooting if they found it was established by a preponderance of the evidence.

It is well-established that is permissible for a prior bad act to be established by a preponderance of the evidence in criminal cases. *See Estelle*, 502 U.S. at 73-74. It is also well-established in this Circuit that where, as here, the instruction regarding the prior bad act explicitly limits the preponderance standard to that preliminary fact, such instruction does not create ambiguity that the elements of the offense must be established beyond a reasonable doubt. *Schultz v. Tilton*, 659 F.3d 941, 945 (9th Cir. 2011). Indeed, the Ninth Circuit and the California Supreme Court alike have upheld nearly identical instructions that "provid[ed] additional guidance on the permissible use of the other-acts evidence and remind[ed] the jury of the standard of proof for a conviction of the charged offenses." *Id.*; *Hiskas v. Pliler*, 262 Fed. App'x 4, 6 (9th Cir. 2007); *People v. Loy*, 52 Cal. 4th 46, 75 (2011); *People v. Reliford*, 29 Cal. 4th 1007, 1016 (2003).

In following CALCRIM 375, the trial court did just that, emphasizing to the jury:

> And if you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the allegations that the defendant personally used a firearm or personally and intentionally inflicted great bodily injury or death on Dawonye Taylor have been proved. The People must still prove the charge and allegations beyond a reasonable doubt.

ECF 18-14 at 148 (Reporter's Transcript at 1306); *People v. Smith*, 2013 WL 4017400, at *9. As the Court of Appeal found, this language ensured that a jury could not reasonably believe that it was permitted to apply the preponderance standard to the charged crime. *See Schultz*, 659 F.3d at 944-45.

United States District Court
Northern District of California

In addition, the trial court gave the initial reasonable doubt instruction, CALCRIM 220, in which the court defined reasonable doubt and instructed, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically advise you or tell you otherwise." *See* ECF 18-14 at 135 (Reporter's Transcript at 1293). The Court also instructed that, as to identity, "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find that the defendant is not guilty." ECF 18-14 at 142-43 (Reporter's Transcript at 1300-01). Then, subsequent to giving CALCRIM 375, the trial court reiterated: "The People have the burden of proving each allegation beyond a reasonable doubt, and if the People have not met their burden, you must find that the allegation has not been proved." ECF 18-14 at 152 (Reporter's Transcript at 1310). These instructions further bolster the Court's conclusion that the jury instructions "as a whole" unambiguously permitted a jury only to convict a defendant based on the beyond a reasonable doubt standard.

Petitioner does not contest any of the foregoing. Instead, Petitioner's claim is narrow: He contends that none of the above clarifying instructions could have any effect in his case because "there was no difference between finding petitioner's testimony credible and determining whether he was guilty of the charged offense." Pet. at m-11. That is, "[t]he question of petitioner's guilt turned directly on whether or not the jury believed petitioner's alibi testimony." *Id.* First of all, it simply is not true that Petitioner's credibility was determinative of his guilt. As the U.S Supreme Court has held, "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *Estelle*, 502 U.S. at 69. Though Petitioner may have chosen to focus on the issue of identity at trial, the jury was still required to find each element of first degree murder based on the prosecution's evidence.

Furthermore, even it is true that Petitioner's alibi was the key issue at trial, it does not follow that Petitioner's credibility turned only on whether the jury believed he committed the 2009 shooting. As Respondent points out and as the Court of Appeal determined, there were other factors that could have undermined Petitioner's credibility in the jury's eyes. *See* ECF 19-1 ("Answer") at 20. To name just one of the factors that the Court of Appeal highlighted, Petitioner

27

acknowledged at trial that he had previously given two alibis other than the one he ultimately asserted (i.e., that he was with his friend Laura Richardson at his grandmother's house). *See People v. Smith*, 2013 WL 4017400, at *4. And of course, the jury could have assessed Petitioner's demeanor while on the stand. *See generally Miller v. Fenton*, 474 U.S. 104, 114 (1985) ("[T]he credibility of witnesses . . . turns largely on an evaluation of demeanor . . . .").

For these reasons, the Court cannot agree that a finding that Petitioner committed the 2009 shooting was tantamount to a finding that he was guilty of the crime of conviction. Therefore, having affirmed the Court of Appeal's conclusion that the jury instructions duly confined the preponderance of the evidence standard to the 2009 shooting, the Court rejects Petitioner's second claim of instructional error.

Because neither claim of error has merit, the Court DENIES Petitioner's request for habeas relief based on Claim 2.

### C. Claim 3: Violation of Right to Present a Complete Defense Based on Trial Court's Refusal to Permit Petitioner to Testify Regarding "C"

At trial, the court precluded Petitioner from testifying that he knew the true identity of "C" without first laying a proper foundation, as required to introduce evidence of third party culpability under California law. On direct appeal, the Court of Appeal affirmed the trial court's ruling on the ground that Petitioner failed to make an offer to provide such foundation. The California Supreme Court summarily denied Petitioner's request for review of the direct appeal (Case No. S212883), so this Court reviews the Court of Appeal's decision.

Claim 3 is that the trial court should have permitted Petitioner to testify that he knew the true identity of "C," and that its refusal to do so violated Petitioner's Fourteenth and Sixth Amendment rights. *See* Pet. at m-14. Petitioner makes two arguments: (1) that the proffered evidence was not third party culpability evidence, meaning foundation was not required; and (2) alternatively, that the trial court was required to permit Petitioner to offer third party culpability evidence—even without foundation—pursuant to the U.S. Supreme Court's holding in *Holmes v. South Carolina*, 547 U.S. 319, 320 (2006). As explained below, the Court finds that neither is meritorious.

### i.   State Court Decision

The Court of Appeal found no evidentiary or constitutional error in the trial court's ruling that Petitioner had to offer foundation before testifying that he knew the identity of "C":

> Defendant argues that the trial court violated his constitutional rights by prohibiting him from presenting evidence of the identity of the real "C." This contention fails for several reasons.

> Defense counsel asked defendant, "Do you know anybody in your neighborhood who goes by the nickname of C?"  Defendant responded "Yes."  Counsel then asked, "What's that person's true name?" to which defendant responded, "I don't know."  The latter answer was stricken after the prosecutor objected on the grounds of "relevance without foundation for third-party culpability."  In chambers, the prosecutor explained, "[s]o my objection, I think this line of questioning is somehow trying to establish third-party culpability, and I don't think any kind of threshold has been met in order to get that evidence in."  The court asked defense counsel, "is this where this is going, that somehow this is all a grave mistake and that is the other C who did this, not [defendant]?"  Defense counsel responded, "Well, yes" and the court ruled, "Okay.  Then there definitely would need to be a greater foundation shown than this.  At this point I will sustain, you know, the objection at this point.  If you lay a foundation, that's very different."  The defendant offered no further testimony on this subject, and made no further offer of proof that the court rejected.

> Thus, the only evidence presented was that defendant knew somebody else who used the nickname "C."  This answer was not stricken.  As to the identity of this supposed other person, defendant testified he did not know his name.  Although the answer was stricken, there can be little objection to striking the answer that defendant did not know the answer to the question.  Beyond that, defendant made no further offer of proof.  There was no attempt to present evidence identifying this supposed other person in some manner other than by name.  Moreover, the court was correct in requiring a foundation for the admission of third-party culpability evidence.  "[T]here must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*People v. Hall* (1986) 41 Cal.3d 826, 833.)  Defendant made no offer to provide such a foundation or to prove any facts tending to identify any other person as the perpetrator of the killing.

> Section 354, subdivision (a) states: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."  Therefore, "[a]s a condition precedent to challenging the exclusion of proffered testimony, [citation], ... the proponent [must] make known to the court the 'substance, purpose, and relevance of the excluded evidence.' "  (*People v. Ramos* (1997) 15 Cal. 4th 1133, 1178.)

Although the court terminated counsel's line of questioning without a foundation, it did not rule on the admissibility of any proffered evidence.  Neither the trial court nor this court can evaluate the admissibility of proposed evidence that is not properly described.  An offer of proof " 'must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued [citation].  The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness.' " (*Bowman v. Wyatt* (2010) 186 Cal. App. 4th 286, 329; see also *People v. Pride* (1992) 3 Cal. 4th 195, 237 [absent an offer of proof as to what the testimony would have been, defendant has not preserved any challenge to its exclusion on appeal].)  There is thus no basis to conclude that the trial court excluded any particular evidence, much less evidence that was admissible, and still less that the court's ruling deprived defendant of his constitutional rights.

*People v. Smith*, 2013 WL 4017400, at *10–11.

### ii.   Discussion

Per the above excerpt, the Court of Appeal held that the trial court properly stopped Petitioner from testifying that he knew someone else nicknamed "C" without first laying foundation.  In so doing, the Court of Appeal found no error under California law and no constitutional error.  Petitioner challenges the Court of Appeal's ruling on two grounds, which the Court now takes in turn.

As to the first, the Court of Appeal specifically held that the trial court "was correct in requiring a foundation for the admission of third-party culpability evidence."  *People v. Smith*, 2013 WL 4017400, at *10 (citing *People v. Hall*, 41 Cal. 3d 826, 833 (1986)).  Thus, Petitioner argues that the Court of Appeal's conclusion that Petitioner's testimony required foundation is erroneous because its premise that the proffered testimony was "third-party culpability evidence" is erroneous.  Pet. at m-15.  In Petitioner's view, his testimony "was not actually third-party culpability evidence."  *Id.*  To be precise, Petitioner maintains that "[t]here were two logical purposes for petitioner to identify C": one was to support a theory of third party culpability and the other was "to support the credibility of petitioner's trial testimony, when he denied that he was C." *Id.*  Petitioner describes third party culpability as a "theory that the person who committed this homicide was someone else, nicknamed C."  *Id.*  Petitioner distinguishes this from "a complete denial that he was the person who . . . committed this homicide," which he says was the purpose of his proposed testimony about "C."  *Id.* at m-16.

30

1        This is a false distinction.  As Petitioner himself explains, the proposed testimony only

2   constitutes a "complete denial" that he was "C" in that "[t]he best way for petitioner to show that

3   he was not 'C' was to identify or describe to the jury who 'C' was."  *Id.* at m-16.  But

4   "identify[ing] or describe[ing] to the jury who 'C' was" is the very definition of third party

5   culpability evidence.  Although Petitioner attempts to use a different term to characterize his

6   proffered testimony, the two "purposes" are in fact the same.  Furthermore, the Court observes that

7   at trial, Petitioner's counsel agreed that he was attempting to offer evidence of third party

8   culpability.  *People v. Smith*, 2013 WL 4017400, at *10.  Petitioner's post hoc argument to the

9   contrary is specious.

10        Having rejected Petitioner's claim that his testimony was not evidence of third party

11   culpability, the Court turns to Petitioner's alternative claim that he had a constitutional right to

12   introduce evidence of third party culpability in this case.  Petitioner does not dispute that

13   California evidence law, as a general matter, requires foundation before admitting evidence of

14   third party culpability, *see* Reply at 5.  *See People v. Gutierrez*, 28 Cal. 4th 1083, 1135-37 (2002),

15   as *modified* (Oct. 2, 2002) (affirming foundation requirement of "direct or circumstantial evidence

16   linking the third person to the actual perpetration of the crime" under *Hall*, 41 Cal. 3d at 833).

17   Rather, he asserts that application of that evidentiary rule here violated his Sixth Amendment

18   "right to have compulsory process for obtaining witnesses in his favor," and his Fourteenth

19   Amendment "right to present a meaningful defense."  Pet. at m-16 to m-17 (citing *Webb v. Texas*,

20   409 U.S. 95, 98 (1972); *Washington v. Texas*, 388 U.S. 14, 23 (1967)).

21        It is certainly true that, "[w]hether rooted directly in the Due Process Clause of the

22   Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth

23   Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present

24   a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations and

25   citations omitted).  However, that right is not absolute.  The U.S. Supreme Court has recognized

26   time and again that "state and federal rulemakers have broad latitude under the Constitution to

27   establish rules excluding evidence from criminal trials."  *United States v. Scheffer*, 523 U.S. 303,

28   308 (1998).  Pursuant to those rules, "even relevant and reliable evidence can be excluded when

United States District Court
Northern District of California

the state interest is strong." *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).

Accordingly, the U.S. Supreme Court has "[o]nly rarely . . . held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).  Specifically, only rules that "infringe upon a weighty interest of the accused and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve'" violate the right to present a complete defense.  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Scheffer*, 523 U.S. at 308).

Although the U.S. Supreme Court's cases "contain several illustrations of 'arbitrary' rules, i.e., rules that excluded important defense evidence but that did not serve any legitimate interests," *Holmes*, 547 U.S. at 325, the instant rule is not one of them.  That is, the U.S. Supreme Court has never held unconstitutional a rule that evidence of third party culpability is admissible only if the defendant offers a foundation of "direct and circumstantial evidence linking the third person to the actual perpetration of the crime."  Indeed, the U.S. Supreme Court has not "decided any case squarely addressing the discretionary exclusion of evidence and the right to present a complete defense or establishing a controlling legal standard for evaluating such exclusions."  *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (internal quotations and alterations omitted).  Because no decision of the U.S. Supreme Court clearly establishes that the foundation requirement of *Hall*, 41 Cal. 3d 826, and its progeny is unconstitutional, the decision of the State Court of Appeal is not contrary to or an unreasonable application of clearly established federal law.  *Accord Morales v. Hedgpeth*, No. 212CV0544TLNKJNP, 2016 WL 3562749, at *7 (E.D. Cal. July 1, 2016).

Despite this, Petitioner contends that the Court of Appeal's ruling violates the U.S. Supreme Court's holding in *Holmes*, 547 U.S. 319.  In that case, the U.S. Supreme Court invalidated the South Carolina Supreme Court's rule that "where there is strong evidence of a defendant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt may (or perhaps must) be excluded."  *Id.* at 329 (internal quotations and alterations omitted).  But of course, that is not the rule the Court of Appeal or the trial court applied in this case.  The Court of Appeal's opinion does not suggest that either court relied upon the strength of the evidence of Petitioner's guilt in requiring Petitioner to lay foundation.  And

United States District Court
Northern District of California

United States District Court
Northern District of California

1    although the Court of Appeal noted that Petitioner's proffered evidence "would not have negated

2    Green's positive identification of petitioner as the shooter, regardless of whether he was called C

3    or any of the other nicknames that the evidence showed that he used from time to time," Pet. at m-

4    17 (quoting *People v. Smith*, 2013 WL 4017400, at *11), that statement was made in evaluating

5    Petitioner's ineffective assistance of counsel claim.  *See People v. Stankewitz*, 51 Cal. 3d 72, 113

6    (1990) (explaining that a defendant claiming ineffective assistance of counsel must show "it is

7    reasonably probable a determination more favorable to the defendant would have resulted in the

8    absence of counsel's failings).  Hence, Petitioner is not correct that the foundation requirement

9    applied in this case violates *Holmes*.

10        Additionally, though Petitioner does not argue that the rule in *Hall* renders state

11    proceedings "so fundamentally unfair as to violate due process," the Ninth Circuit has expressly

12    rejected that proposition.  *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999).

13        In sum, the Court does not find any constitutional error in requiring a defendant to provide

14    foundation before offering evidence of third-party culpability.

15        There remains one final matter to address.  In his Reply, Petitioner appears to make yet a

16    third argument for reversal of the Court of Appeal's ruling: that he met the foundation requirement

17    under California law by providing "direct or circumstantial evidence linking the third-party to the

18    alleged crime."  *See* Reply at 5.  However, the record in this case does not support that assertion.

19    As the Court of Appeal held, Petitioner did not make an offer of proof of foundation.  Although

20    the trial court told defense counsel, "If you lay a foundation, that's very different," Petitioner made

21    "no attempt to present evidence identifying this supposed other person in some manner other than

22    by name." *People v. Smith*, 2013 WL 4017400, at *10.  Petitioner does not dispute the foregoing;

23    instead, Petitioner seems to believe that the foundation requirement was met in that "there was

24    already direct evidence that a person named C committed the shooting."  Reply at 5.  But

25    foundation means evidence linking the *particular* third party to the alleged crime.  Where, as here,

26    the only link is the name C, it would be bootstrapping for Petitioner to rely on evidence that a

27    person named C committed the shooting as foundation to testify that someone else was named C.

28        Having rejected all of Petitioner's claims of error, the Court DENIES Petitioner's request

1    for habeas relief based on Claim 3.

2        **D.    Claim 4: Ineffective Assistance of Counsel**

3        In Claim 4, Petitioner asserts a claim for ineffective assistance of counsel under the Sixth

4    Amendment based on his counsel's alleged failure to make an offer of proof to provide foundation

5    for Petitioner's identification of "C."  Petitioner brought this claim in his first state habeas petition

6    before the California Court of Appeal, where it was rejected.  The California Supreme Court then

7    summarily denied review.

8        Petitioner now renews his claim for ineffective assistance of counsel, claiming that the

9    California Court of Appeal erred in its application of the relevant standard under *Strickland v.*

10   *Washington*, 466 U.S. 668, 688 (1984).  Below, the Court affirms the Court of Appeal's finding

11   that Petitioner has not made out a claim for ineffective assistance of counsel.

12           **i.    State Court Decision**

13       The California Court of Appeal considered and rejected Petitioner's ineffective assistance

14   of counsel claim as follows:

15           Defendant argues alternatively that his attorney's failure to provide a
     proper offer of proof constituted ineffective assistance of counsel.  However, in
16   the absence of any indication of what evidence the attorney had to offer, and of
     the attorney's reasons for failing to make an offer, we are in no position to say
17   that his performance amounted to constitutionally inadequate representation.
     Moreover, we certainly cannot say "that it is 'reasonably probable a determination
18   more favorable to the defendant would have resulted in the absence of counsel's
     failings.' " (*People v. Stankewitz* (1990) 51 Cal. 3d 72, 113.)  Even if defendant
19   had been able to produce evidence of another person named "C," that evidence
     would not have negated Green's positive identification of defendant as the
20   shooter, regardless of whether he was called "C" or any of the other nicknames
     that the evidence showed he used from time to time (e.g. "Young Stank" or
21   "Jewels").

22

23   *People v. Smith*, 2013 WL 4017400, at *11.

24           **ii.    Discussion**

25       In the preceding section, this Court affirmed the Court of Appeal's conclusion that the trial

26   court properly prevented Petitioner from testifying that he knew the true identity of "C" without

27   first providing a foundation for that evidence, which Petitioner never offered to provide.

28   Petitioner's ineffective assistance claim is based on his counsel's alleged failure to make an offer

of proof to provide the required foundation.

To prevail on a Sixth Amendment claim for ineffective assistance of counsel, the claimant bears the burden of establishing two things. First, he must show that counsel's performance was "deficient," i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, he must show that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceedings. *Id.*

When evaluating an ineffective assistance of counsel claim under § 2254, a federal habeas court must apply a "doubly deferential" judicial review. *Premo v. Moore*, 562 U.S. 115, 122 (2011). Even under *de novo* application, the general rule of *Strickland* requires the court to judge a defense counsel's representation with great deference. *Id.*; *see, e.g.*, *Cheney v. Washington*, 614 F.3d 987, 996 (9th Cir. 2010) ("Under *Strickland*, the court must indulge a strong presumption that counsel acted for tactical reasons rather than through sheer neglect."). On top of that, the AEDPA requires federal courts to defer to the state court's decision unless its application of Supreme Court precedent is "objectively unreasonable." *Cheney*, 614 F.3d at 995 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'" *Id.*

In addition, *Strickland* provides courts with a general standard, rather than a specific legal rule. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Because judicial application of a general standard "can demand a substantial element of judgment," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citing *Yarborough*, 541 U.S. at 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")). That latitude "translates to a narrower range of decisions that are

35

1   objectively unreasonable under AEDPA." *Cheney*, 614 F.3d at 995.

2   In sum, under § 2254(d), "the question is not whether counsel's actions were reasonable.

3   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s

4   deferential standard." *Harrington*, 562 U.S. at 105.

5   Here, the Court of Appeal found that Petitioner had not met his burden of showing either

6   deficient performance or prejudice under *Strickland*. The Court of Appeal explained that because

7   Petitioner did not make an offer of proof, it had "no indication of what evidence the attorney had

8   to offer, and of the attorney's reasons for failing to make an offer." *People v. Smith*, 2013 WL

9   4017400, at *11. Without that information, the Court of Appeal believe it was "in no position to

10  say that his performance amounted to constitutionally inadequate representation" or that Petitioner

11  was prejudiced by the exclusion of this unknown evidence. *Id.*

12  Petitioner argues that "[w]here the claim is that counsel was deficient for not making an

13  offer of proof, the state court erred in requiring petitioner to state what the offer of proof would

14  have been." Pet. at m-19. In Petitioner's view, such a requirement is "circular" and "create[s] an

15  impossible standard for petitioner to meet." *Id.*

16  The Court does not agree. Claims of ineffective assistance of counsel based on defense

17  counsel's failure to investigate are instructive in this regard. The Ninth Circuit has held that a

18  defendant cannot make out a claim for ineffective assistance if she or he "fails to state what

19  additional information would be gained by the discovery she or he now claims was necessary."

20  *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001), *amended on denial of reh'g*, 253 F.3d 1150

21  (2001). Just as those defendants must identify the evidence that an investigation that never

22  occurred would have revealed, Petitioner was required to identify the foundation that his defense

23  counsel did not provide. Put another way, Petitioner's defense counsel did not perform deficiently

24  unless there was some foundation—i.e., direct or circumstantial evidence connecting the third

25  party to the murder—that counsel could have proffered to the Court. *See United States v.*

26  *Sahakian*, 14 Fed. App'x 876, 877 (9th Cir. 2001) (holding counsel could not have been deficient

27  for failing to offer evidence that "would not have altered" the district court's exclusion of

28  Sahakian's justification defense). Petitioner did not establish the existence of such evidence

United States District Court
Northern District of California

36

1    before the Court of Appeal, and he makes no effort to do so now.  For instance, Petitioner has not

2    pointed to relevant evidence in the record or submitted affidavits in support of his claim.  His

3    vague and speculative assertion that "counsel would certainly have known what petitioner was

4    going to say about the identity of C" does not suffice.  *Cf. Thomas v. McGrath*, 329 Fed. App'x

5    85, 86 (9th Cir. 2009) ("Thomas's offer of proof, unsupported by any affidavits, provides

6    insufficient evidence as to each witness's potential testimony.").

7        Relatedly, Petitioner argues that "there was not, nor could there have been, any valid trial

8    strategy not to make an offer of proof."  Pet. at m-18.  But as Respondent points out, the valid

9    "trial strategy" is obvious: "Counsel could have reasonably concluded he lacked an offer of proof

10   that would satisfy the requirements for the admission of third-party culpability evidence."  Answer

11   at 30.  It can scarcely be gainsaid that counsel is not required to proffer evidence that he did not

12   possess.

13       Under these circumstances, this Court finds that the Court of Appeal reasonably

14   determined that Petitioner had not met his burden of showing deficient performance.  The Court

15   likewise holds that the Court of Appeal's finding as to prejudice was reasonable.  The Court

16   agrees that Petitioner's failure to propose an adequate offer of proof that defense counsel should

17   have given also precludes any finding of prejudice under *Strickland*.  Without a proposed offer of

18   proof, Petitioner cannot show that the trial court would have admitted Petitioner's testimony, had

19   defense counsel had made the offer.  *Accord Vicente v. Scribne*r, No. CV 08-4357-MMM SH,

20   2010 WL 7138742, at *9 (C.D. Cal. Apr. 22, 2010), *report and recommendation adopted*, No. CV

21   08-4357-MMM SH, 2011 WL 3321475 (C.D. Cal. July 29, 2011) ("Here, petitioner has failed to

22   show that there is a reasonable probability that, but for his trial counsel's failure to make a more

23   detailed offer of proof, the result of the trial would have been different."); *See United States v.*

24   *Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) ("Berry has not demonstrated that he was prejudiced

25   by counsel's actions" because he "offers no indication of what these witnesses would have

26   testified to, or how their testimony might have changed the outcome of the hearing.").

27       Thus, the Court holds that the California Court of Appeal properly rejected Petitioner's

28   claim of ineffective assistance of counsel for failure to establish either deficient performance or

United States District Court
Northern District of California

prejudice under *Strickland*. Petitioner's request for habeas relief based on Claim 4 is DENIED.

### E. Claim 5: Due Process and Sixth Amendment Violations Based on Superior Court's Rejection of Petitioner's Claim under Cal. Penal Code § 1473(b)(3)

In Claim 5, Petitioner argues that his Fourteenth Amendment right to due process was violated by the Superior Court's rejection of his claim under California Penal Code § 1473(b)(3), which is a claim that "[n]ew evidence exists that . . . would have more likely than not changed the outcome at trial." Specifically, Petitioner argues that the Superior Court misapplied the requirements of California Penal Code § 1473(b)(3) when it determined that he was not entitled to relief, in violation of the U.S. Supreme Court's holding in *Hicks v. Oklahoma*, 447 U.S. 343 (1980). Pet. at m-22. Having reviewed the record before the Superior Court and the applicable law, the Court finds no error, constitutional or otherwise, in the Superior Court's finding.

#### i. State Court Decision

To briefly summarize, Petitioner's state habeas petition before the California Court of Appeal (Case No. A137965) included a claim that newly discovered evidence demonstrated his innocence. The Court of Appeal evaluated the claim under the then-existing standard for such claims, *e.g.*, *In re Lawley*, 42 Cal. 4th 1231, 1238 (2008). *See People v. Smith*, 2013 WL 4017400, at *12. The Court of Appeal held that Petitioner had made a prima facie showing of factual innocence and remanded the case to the Superior Court to evaluate the "credibility of the new evidence, and its ultimate significance in view of the other evidence submitted at trial" following an evidentiary hearing. *People v. Smith*, 2013 WL 4017400, at *12.

The Superior Court (Case No. 166345) conducted the evidentiary hearing over the course of three days in February and March 2017. *See* ECF 18-17 (Reporter's Transcript of evidentiary hearing). By that time, the law governing Petitioner's claim had changed. Specifically, as of 2017, the California Penal Code allows an individual to petition for state habeas relief where "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." Cal. Penal Code § 1473(b)(3). The Superior Court recognized the applicability of this amendment to Petitioner's claim: "Although the Petition in this case was filed in 2013, the Court applies the

United States District Court
Northern District of California

1    new standard articulated in the 2017 statute because the habeas proceedings are not final."  ECF

2    18-17 at 355 (Sup. Ct. opinion at 10).

3         At the hearing, Petitioner introduced three pieces of evidence: (1) "the testimony of Patrick

4    Smith, who acknowledged that he was driving the car that was involved in the incident and that he

5    witnessed the shooting by a man he knew as 'C' and that Petitioner is not that man"; (2)

6    "Petitioner's cell phone records indicating that Petitioner was not speaking on his cellphone at a

7    point before the killing when Robert Green testified the person who shot the victim was speaking

8    on his cell phone," and (3) "the 'enhanced video' which assertedly shows details of Green's

9    testimony were incorrect."  ECF 18-17 at 355-56 (Sup. Ct. opinion at 10-11).

10        Applying the standards of § 1473(b)(3), the Superior Court found that "only the testimony

11   of Patrick Smith qualifies as new evidence, since he was a co-participant in the incident and was

12   cloaked with the protection of the Fifth Amendment privilege as his case had not yet been resolved

13   at the time of Petitioner's trial."  *Id.* at 356 (Sup. Ct. opinion at 11).  The Superior Court

14   "nevertheless agreed to consider any testimony or evidence at the hearing under the reasoning of"

15   *In re Hall*, 30 Cal. 3d 408, 420 (1981) ("[A] habeas corpus petitioner must first present newly

16   discovered evidence that raises doubt about his guilt; once this is done, he may introduce any

17   evidence not presented to the trial court and which is not merely cumulative in relation to evidence

18   which was presented at trial insofar as it assists in establishing his innocence.") (internal

19   quotations and citation omitted).  The Superior Court "also listened to and observed the testimony

20   of Deputy District Attorney Gregory Dolge and Theodore 'Ted' Berry, Patrick Smith's attorney,"

21   who testified for the State.  ECF 18-17 at 357 (Sup. Ct. opinion at 12).

22        After hearing and assessing the evidence, the Superior Court found that "the testimony of

23   Patrick Smith was not credible" and that "[b]ecause it lacked credibility, it failed to meet the

24   standard of being more likely than not to have changed the outcome at trial."  ECF 18-17 at 356

25   (Sup. Ct. opinion at 11).  The court further found that "the 'enhanced video' added nothing to the

26   video evidence already presented at trial" and that "[t]here was nothing in the phone records that

27   had decisive force or value."  *Id.*  The court therefore determined that "Patrick Smith's testimony,

28   the enhanced video and the phone records lack such decisive force and value that it would have

1   more likely than not changed the outcome at trial." *Id.* at 369 (Sup. Ct. opinion at 24).  The

2   Superior Court denied the petition.  *Id.*

3         The full text of the Superior Court's 24-page opinion is available at ECF 18-17, Exhibit 9.

4   Presented with this claim in a subsequent habeas petition, the California Supreme Court denied the

5   petition without comment; *see* ECF 19; hence, the last reasoned decision belongs to the Superior

6   Court.

7         **ii.   Discussion**

8         Petitioner argues that the Superior Court's finding that he was not entitled to a writ of

9   habeas corpus under California Penal Code § 1473(b)(3) violated his right to due process.

10  Specifically, he contends the Superior Court "failed to properly apply" § 1473(b)(3) when it

11  erroneously concluded the Patrick Smith's testimony was not credible.  *See* Pet. at m-22.

12        As discussed at length above, "it is only noncompliance with *federal* law that renders a

13  State's criminal judgment susceptible to collateral attack in the federal courts"; "federal habeas

14  corpus relief does not lie for errors of state law."  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010)

15  (emphasis in original).  Where, as here, a petitioner's claim is based on an allegedly erroneous

16  application of a state statute, the petitioner is not entitled to relief unless that error "also entailed

17  the infringement of [a] federal right."  *Id.*; *see also Estelle*, 502 U.S. at 67.

18        Of relevance here, the U.S. Supreme Court has expressly left "open" the question whether

19  "an asserted federal constitutional right to be released upon proof of 'actual innocence'" exists.

20  *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009); *see also*

21  *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("[The existence merely of newly discovered

22  evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas

23  corpus.").  Thus, the U.S. Supreme Court has never clearly established that a defendant's federal

24  constitutional rights are violated by a failure to vacate his conviction upon a showing of actual

25  innocence—regardless whether that showing is made under a "probable innocence" standard, *see*

26  *Herrera*, 506 U.S. at 402, or the lesser showing required by § 1473(b)(3).  For that reason, the

27  Superior Court's rejection of Petitioner's claim based on newly discovered evidence cannot be

28  contrary to, or an unreasonable application of, clearly established federal law.  *Accord Valerio v.*

United States District Court
Northern District of California

*Frauenheim*, No. 2:17-CV-07706-MAA, 2019 WL 6310267, at *36 (C.D. Cal. Nov. 25, 2019); *see Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established Federal law.") (internal quotations and alterations omitted).

Petitioner does not dispute any of the foregoing; indeed, he disclaims asserting a freestanding right to relief upon proof of actual innocence. *See* Reply at 7.  Rather, he argues that a different "federal right" has been violated here: his right to due process, as articulated in *Hicks v. Oklahoma*, 447 U.S. 343 (1980).  In *Hicks*, the U.S. Supreme Court held that "[a] State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (citing *Hicks*, 447 U.S. at 346); *Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state.").

In this case, the "state law entitlement" Petitioner asserts is state habeas relief.  That is, Petitioner argues that because he satisfied the requirements for relief under California Penal Code § 1473(b)(3), the Superior Court "was required to overturn his conviction" such that its refusal to do denied him a state law entitlement.  Reply at 7; *see* Pet. at m-20 to m-22.

Petitioner's argument lacks merit.  California Penal Code § 1473(b)(3) provides for state habeas relief if "[n]ew evidence exists that is credible, material, presented without substantial delay, and with such decisive force and value that it would have more likely than not changed the outcome at trial."  Under *Hicks*, Petitioner was "entitled" to invoke the state statutory procedure afforded by California Penal Code § 1473; i.e., he was entitled to have the state court consider his new evidence and determine whether it justified habeas relief.  He was not, however, "entitled" to substantive relief under § 1473. *Accord Prescott v. Santoro*, No. 5:16-CV-01359-EJD, 2019 WL 6771826, at *6 (N.D. Cal. Dec. 12, 2019); *Renteria v. Montgomery*, No. CV1903117FMORAO, 2020 WL 1426639, at *14 (C.D. Cal. Feb. 20, 2020), *report and recommendation adopted*, No. CV1903117FMORAO, 2020 WL 1332088 (C.D. Cal. Mar. 23, 2020); *Stevenson v. Los Angeles*

United States District Court
Northern District of California

41

United States District Court
Northern District of California

*Superior Court*, No. CV 19-4622 CJC(JC), 2019 WL 2437001, at *4 (C.D. Cal. June 10, 2019); *cf.*

*House v. Gipson*, No. 1:11-CV-00687-SKO-HC, 2014 WL 1366148, at *7 (E.D. Cal. Apr. 7,

2014). In this case, there was no deprivation of Petitioner's state law entitlement to have his claim

based on newly discovered evidence considered—arbitrary or otherwise. Petitioner was able to

thoroughly litigate his state law claim under § 1473(b), including receiving a three-day evidentiary

hearing in state court and lengthy reasoned opinion based upon that hearing. That is all

§ 1473(b)(3) entitles him to.

In any event, even if an error by the Superior Court in assessing Petitioner's § 1473(b)(3)

claim could give rise to federal habeas relief, the Court finds no such error. First, Petitioner

suggests that the Superior Court applied the pre-2017 version of § 1473, under which a habeas

petitioner "was required to create fundamental doubt in the accuracy of the proceedings and 'point

unerringly to innocence or reduced culpability.'" Pet. at m-21 to -m22 (quoting *People v.*

*Gonzalez*, 51 Cal. 3d 1179, 1246 (1990)). But there is no indication in the Superior Court's

opinion that it applied that standard. On the contrary, the Superior Court acknowledged the

freshly-made statutory amendment; it then recited and applied the correct standard:

> At the beginning of this year, the law changed regarding the standard for a
> habeas petition brought under "newly discovered evidence." Under section
> 1473(b)(3) a person may now prosecute a writ of habeas corpus when "New
> evidence exists that is credible, material, presented without substantial delay, and
> of such decisive force and value that it would have more likely than not have
> changed the outcome at trial." (§1473(b)(3)(A); *In re Miles* (2017) 7 Cal. App.
> 5th 821, 828.) The statute defined "new evidence" as "evidence that has been
> discovered after trial, that could not have been discovered prior to trial by the
> exercise of due diligence, and is admissible and not merely cumulative,
> corroborative, collateral, or impeaching." (§1473(b)(3)(B).) Although the
> Petition in this case was filed in 2013, the Court applies the new standard
> articulated in the 2017 statute because the habeas proceedings are not final.
> (*Miles*, supra, 7 Cal. App. 5th at p.840.)

ECF 18-17 at 356 (Sup. Ct. opinion at 9-10). The Court thus rejects the Petitioner's contention

that the Superior Court "failed to properly apply the newly modified section 1473."

The second "error" that Petitioner says the Superior Court committed in its application of

§ 1473(b)(3) was determining that Patrick Smith's new evidence was not credible. *See* Pet. at m-

22 to m-24. Critically, however, "[t]itle 28 U.S.C. § 2254(d) does not give federal habeas courts

the license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Koepplin v. Risley*, 928 F.2d 408 (9th Cir. 1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)); *see also Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir. 2004) ("Here, because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings."). Accordingly, this Court must defer to the Superior Court's credibility finding regarding Smith's testimony "unless the finding is not fairly supported by the record considered as a whole." *Carriger v. Stewart*, 132 F.3d 463, 473 (9th Cir. 1997).

Here, following a lengthy and thorough evidentiary hearing, the Superior Court engaged in a similarly lengthy and thorough review of Patrick Smith's testimony. *See* ECF 18-17 at 356 (Sup. Ct. opinion at 11-22). The Superior Court ultimately found Patrick Smith's testimony not credible for several reasons.

First, the Superior Court observed that Patrick Smith gave three separate statements: (1) a 2011 statement he made to Deputy District Attorney ("DDA") Gregory Dolge in the form of a proffer, (2) an affidavit he signed in 2012 upon a request by Petitioner's father, and (3) his testimony at the evidentiary hearing in 2017. His testimony contradicted the prior two statements on certain points. For instance, the affidavit stated, "I know C, who shot Taylor, and told Dolge and the investigator who was with Dolge that the photo was not a photo of the shooter." ECF 18-16 at 112 (Patrick Smith Affidavit); ECF 18-17 at 142 (Hearing Tr. at 136); *see* ECF 18-17 at 361 (Sup. Ct. opinion at 16). Then, at the hearing, Patrick Smith acknowledged that he had previously attested to the foregoing but testified that statement was "incorrect": He did not ever tell Mr. Dolge that the persons in the photos Mr. Dolge showed him did not depict the shooter. ECF 18-17 at 128, 141 (Hearing Tr. at 122, 135); *see* ECF 18-17 at 361 (Sup. Ct. opinion at 16). The Superior Court found that the prior inconsistent statements "undercut" Smith's testimony that Petitioner was not the shooter. ECF 18-17 at 363 (Sup. Ct. opinion at 18).

Second, the Superior Court found that Patrick Smith had previously identified Petitioner as the shooter to DDA Dolge. Specifically, the court credited Dolge's testimony that during the 2011 proffer session, Patrick Smith "identified photographs of Rushing as being the individual who was

the shooter." ECF 18-17 at 359 (Sup. Ct. opinion at 14); *see* ECF 18-17 at 177 (Hearing Tr. at 165). Moreover, during his testimony, Patrick Smith did not deny making the identification: He acknowledged that he said something "to the D.A. to suggest that [he] could possibly or might possibly identify Mr. Rushing as the shooter" but testified that he "never said, point blank, he was the shooter." ECF 18-17 at 90 (Hearing Tr. at 83); *see* ECF 18-17 at 177 (Hearing Tr. at 165). The Superior Court found that Patrick Smith's prior identification or Petitioner as the shooter undermined his testimony at the evidentiary hearing that Petitioner was not the shooter. ECF 18-17 at 363 (Sup. Ct. opinion at 18).

Third, at the evidentiary hearing, Patrick Smith "testified that he knew who 'C' is," but repeatedly "refused . . . to identify him." ECF 18-17 at 362 (Sup. Ct. opinion at 17); *see* ECF 18-17 at 144 (Hearing Tr. at 138). As the Superior Court explained, this refusal deprived "the court and counsel the opportunity to examine, confirm or refute his claim":

> For example, the court and counsel were unable to examine Smith about the "real shooter's" physical characteristics as they compared to Petitioner. No one was given the opportunity to determine if the "real shooter" had an alibi. No one was able to compare to see if the "real shooter" was one of the many photographs shown to and rejected by Green.

The court therefore found that "his refusal to give complete testimony undermined his credibility." *Id.*

Fourth, "[t]he Court considered Smith's potential bias in determining credibility." ECF 18-17 at 363 (Sup. Ct. opinion at 18). Specifically, Patrick Smith was a co-defendant of Petitioner's; he had been charged for the same incident that gave rise to the instant case. *See id.* at 357 (Sup. Ct. opinion at 12). The Court noted:

> Smith did not make any statement that Petitioner was not the shooter until after his own case resolved and he no longer could be tried and thus suffer penal consequences for his actions during the homicide. Smith did not offer a plausible explanation for why he waited so long to come forward. Even then, Smith did not come forward to law enforcement, but instead did nothing until he was contacted by Petitioner's father.

*See id.* at 363 (Sup. Ct. opinion at 18). The Superior Court further emphasized that "Smith gave his affidavit at the behest of and witnessed by Ollie Rushing, Petitioner's father," and that "Ollie

44

Rushing was present in court while Smith testified." *Id.* at 364 (Sup. Ct. opinion at 19). Petitioner does not dispute any of these facts, but wonders "how this shows bias." Pet. at m-24. The potential bias, however, is clear: Patrick Smith could have been motivated by a desire to help Petitioner or Petitioner's father. In any event, this was just one of several factors relied upon by the court.

Fifth, the Court "considered Smith's demeanor while testifying":

> When Smith was answering questions about the events preceding the murder, and even about the murder itself, he was clear and answered questions directly. His memory was detailed and precise. It duplicated the details he told his lawyer about the crime as memorialized in the proffer given to Greg Dolge and admitted as an exhibit. This portion of his testimony also closely paralleled the testimony of Robert Green. Smith, however, was evasive when asked questions about his previous statements regarding the identity of the shooter. Although he clearly stated at the hearing that Petitioner was not the shooter, he was loath to admit that he also clearly told Greg Dolge that Petitioner was the shooter. Instead he admitted he might have "said something to suggest that he could possibly identify" Petitioner as the shooter.

ECF 18-17 at 364 (Sup. Ct. opinion at 19). It is certainly proper to consider demeanor in assessing credibility, *see Fenton*, 474 U.S. at 114, and this Court is in no position to second guess the Superior Court's assessment of demeanor.

Sixth, '[t]he Court considered Smith's history of committing crimes of moral turpitude." ECF 18-17 at 364 (Sup. Ct. opinion at 19). It is undisputed that Patrick Smith has "multiple convictions for robbery and attempted robbery, a conviction for a felony gun charge, a conviction for evading the police, [and] a conviction for felony grand theft." *Id.* Petitioner does not assert any constitutional error in the Superior Court's consideration of these crimes to assess Patrick Smith's credibility, which is plainly permitted under California law. *Hinton*, 37 Cal. 4th at 888.

As shown, the record supports the Superior Court's well-reasoned finding that Patrick Smith's testimony was not credible; the Court therefore defers to that finding. The Superior Court also appropriately considered Patrick Smith's testimony "against the backdrop of the trial testimony," especially the testimony of eyewitness Robert Green. Accordingly, this Court sees no error in Superior Court's finding that Patrick Smith's testimony was not sufficiently credible to justify relief under § 1473(b)(3).

Finally, Petitioner argues that the Superior Court was wrong to conclude that Petitioner's phone records and the "newly enhanced video of the shooting" presented would not likely have changed the outcome at trial, pursuant to § 1473(b)(3).  Pet. at m-26.  But remember: The Superior Court found that these were not "new evidence" within the meaning of § 1473(b)(3)(B) ("'[N]ew evidence' means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching.").  The cell phone records were provided to defense counsel before the time of trial, ECF 18-17 at 368 (Sup. Ct. opinion at 23); as for the video, "the original video was provided to counsel before trial and was played at trial" and Petitioner stipulated that "the technology used to 'enhance' it was available before trial.  *Id.* at 367 (Sup. Ct. opinion at 22).  Petitioner does not specifically challenge the Superior Court's findings on this issue, and this Court sees no error.  Because § 1473(b)(3)(A) provides for relief only in cases of "new evidence," the Superior Court was not required to consider the phone records or the video at all.  As a result, even apart from the deference this Court must afford the Superior Court's assessment of the weight of evidence, the Superior Court did not err in finding that the standard set out by § 1473(b)(3) was not met.

Having found no violation of federal or constitutional law stemming from the Superior Court's rejection of Petitioner's claim under § 1473(b)(3), Petitioner's request for habeas relief in Claim 5 is DENIED.

### F.    Claim 6: Due Process Violation Based on Exclusion of Evidence at Post-Conviction Evidentiary Hearing

Claim 6 also pertains to Petitioner's claim of new evidence under California Penal Code § 1473(b)(3).  As alluded to above, there was a fourth piece of "new evidence" that Petitioner proffered in his state habeas petition that ultimately was not considered by the Superior Court (Case No. 166345).  That evidence was a declaration from Yolanda Washington that she was present in the apartment at 1406 77th Avenue when "C" left to pursue the victim and that "C" is an individual named Charles Lynn Dunn, Jr., not Petitioner.  ECF 18-17 at 355 (Sup. Ct. opinion at 10); *see* ECF 18-16 at 121-24 (Ex. 4, 5 to state habeas petition).  In Claim 6, Petitioner contends

that the Superior Court's failure to consider Washington's declaration violated his Fourteenth Amendment right to due process.  The Court finds there has been no such violation and denies Petitioner's claim for relief.

### i.   State Court Decision

As set forth in the Factual Background section, *see supra* Part II.B., Petitioner sought to introduce testimony from Yolanda Washington at the evidentiary hearing on his claim under California Penal Code § 1473(b)(3).  In support of his request, Petitioner proffered an affidavit signed on June 12, 2012 by Ms. Washington in which she stated that she was the renter of the apartment at 1406 77th Avenue from which "C" and his compatriots exited immediately prior to the murder.  ECF 18-17 at 355 (Sup. Ct. opinion at 10); *see* ECF 18-16 at 121-24 (Ex. 4, 5 to state habeas petition).  Ms. Washington further stated that "C" was not Petitioner and identified "C" as another individual, Charles Lynn Dunn, Jr.  ECF 18-17 at 355 (Sup. Ct. opinion at 10); *see* ECF 18-16 at 121-24 (Ex. 4 to state habeas petition).

Prior to the evidentiary hearing, the Superior Court held that Ms. Washington's testimony was not "newly discovered" under § 1473(b)(3)(B), but nevertheless agreed to consider it:

> Once the threshold of new evidence raises doubt about the defendant's guilt, then the court can consider evidence that does not technically qualify as newly discovered.  (*In re Hall* (1981) 30 Cal. 3d 408.)  The Court found that Ms. Washington's testimony, Petitioner's cellphone records and the "enhanced video" were not newly discovered; however the Court nevertheless agreed to consider any testimony or evidence at the hearing under the reasoning of *Hall*.

ECF 18-17 at 356 (Sup. Ct. opinion in Case No. 166345 at 11); *see also* ECF 18-17 at 15-16 (Hearing Tr. at 8-9).

Come time for the hearing, however, Petitioner was unable to procure Ms. Washington to testify live: "Petitioner's efforts to subpoena Ms. Washington eventually failed, despite the Court granting three motions to continue to facilitate locating her, over a span of almost five months." ECF 18-17 at 356 (Sup. Ct. opinion in Case No. 166345 at 11); *see also* ECF 18-17 at 15-16 (Hearing Tr. at 8-9).  When Petitioner moved for a fourth continuance based on the unavailability of Ms. Washington, the Superior Court denied the motion.  ECF 18-17 at 36-37 (Hearing Tr. at 29-30).  Petitioner responded by asking the court to instead consider Ms. Washington's affidavit

United States District Court
Northern District of California

pursuant to *In Re Miles*, 7 Cal. App. 5th 821 (2017).  ECF 18-17 at 38-40 (Hearing Tr. at 31-33).

The Superior Court rejected that request in an oral ruling, distinguishing the instant case from

*Miles*:

> [U]nlike *Miles*, . . . we have nothing that points to any basis to allow, under the Evidence Code, Washington's statement.  The co-defendant's statement, um, was, albeit not a Declaration against his interest because the statute of limitations had applied, but there were negative consequences that the Court viewed in a manner that said one would not make these statements under these circumstances because of the potential negative consequences were it not true. And we can couple that with the fact that the two co-defendants testified and said exactly what's in the affidavit, and other witnesses who testified said exactly what's in the affidavit.
>
> So based on all of that, they allowed it, finding clearly it was trustworthy. But that doesn't exist here.  There is absolutely no negative consequence at all that this Court can use for the utilization of an affidavit, a piece of paper of Ms. Yolanda Washington.  Saying that the D.A. interviewed her which is not a statement that's under oath, which would be the case if she were testifying in court and have legal consequences, to me, is not sufficient.  Merely a statement saying, This is what, in fact, happened, by someone that the Court has never seen, the Court has never heard, the Court has never looked at their demeanor, the Court has never seen their responses—which are all factors that the Court can view if she is here in court—and to say that that's trustworthy, I'm sorry, I just don't see that as in this case.
>
> I would even need to find, as you argued, Mr. Lew, that other evidence is credible that corroborates what's in Miss Washington's affidavit in order to essentially be able to consider because that is one of the findings and factors that *Miles* looked at.
>
> I have no idea what the evidence is going to show in Mr. Rushing's matter in this hearing, and I certainly had no opinion at this point as to whether or not I will find that that evidence is credible or not credible and whether it is credible and consistent with corroborating Ms. Washington's affidavit.
>
> I mean, this is a classic reason that you do not have papers coming to the Court in writing without the ability to cross-examine those individuals.  The law has built into it a 1202 exception: If you say something under oath that you have said otherwise in another context, you get the ability under oath to confront them with that so you can assess their credibility.  But simply to put papers before the Court and say, She said this is true in this affidavit, but in this statement to a law enforcement officer, the district attorney, she said something different, and to have that have the ora [sic] of credibility for purposes of the factors present in the Evidence Code, I just simply find do not exist.
>
> This is just a statement by Yolanda Washington, the affidavit.  It was made out of court and would be used, if I allow it, as to the truth of what's in the affidavit without any opportunity to cross-examine her, to ask her any questions at all, to assess her credibility, and in my view, it is just pure through-and-through

1     hearsay with no exception for such a piece of paper coming into evidence.  And I
2     am not prepared to create an exception to the hearsay rule to consider Yolanda
      Washington's affidavit at this habeas proceeding under these circumstances.

3     *Id.* at 46-50 (Hearing Tr. at 39-43).  In other words, the Superior Court excluded Washington's

4     affidavit as inadmissible hearsay.

5                Petitioner now challenges that ruling.

6            **ii.    Discussion**

7                Petitioner claims that the Superior Court erred in two respects: (1) in ruling that Ms.

8     Washington's proposed testimony was not "new" evidence under California Penal Code

9     § 1473(b)(3)(B), and (2) in refusing the consider Ms. Washington's affidavit when she was

10    unavailable to testify in person at the evidentiary hearing.  *See* Pet. at m-28 to m-29.

11               The Court quickly disposes of the first argument.  Although the Superior Court found Ms.

12    Washington's proposed testimony was not "newly discovered" under the definition in California

13    Penal Code § 1473(b)(3)(B)—i.e., "For the purposes of this section, 'new evidence' means

14    evidence that has been discovered after trial, that could not have been discovered prior to trial by

15    the exercise of due diligence, and is admissible and not merely cumulative, corroborative,

16    collateral, or impeaching"—the Superior Court went to say that it would consider the evidence

17    anyhow.  Thus, there could be no prejudice from the Superior Court's statement that Ms.

18    Washington's evidence was not new.

19               The Court now turns to Petitioner's second argument: that the Superior Court erred in

20    refusing to consider the Washington affidavit.  As the above-quoted portion of the hearing

21    transcript shows, the parties agreed—as they appear to here—that the Washington affidavit is

22    hearsay, which is inadmissible under California Evidence Code § 1200, "except as provided by

23    law."  *See also In re Fields*, 51 Cal. 3d 1063, 1070 (1990) ("[A]n out-of-court declaration is

24    hearsay, and unless subject to some exception permitting it to be admitted, should be excluded

25    upon timely and proper objection.").  Petitioner did not assert that the affidavit fell within one of

26    the specific exceptions to hearsay in the California Evidence Code, §§ 1220 *et seq.*  Instead,

27    Petitioner argued that it was admissible under *In re Miles*, 213 Cal. Rptr. 3d 770 (2017), a case in

28    which the California Court of Appeal admitted a hearsay declaration despite the lack of an

United States District Court
Northern District of California

1   applicable hearsay exception.  *Id.* at 787-88.  The *Miles* court considered the declaration because

2   of the "the unique circumstances of [the] case" established the trustworthiness of the declaration.

3   *Id.*  The case was ordered depublished on May 10, 2017.  Cal. Supreme Ct. Dkt. No. S240683.  As

4   the above-quoted passage shows, the Superior Court determined that the circumstances present in

5   *Miles* were not true of the Washington affidavit and therefore declined to consider it.  Petitioner

6   contends that was error.

7          At the outset, the Court reiterates that, as explained in detail with regard to Claim 1, a

8   violation of state evidence law is not a sufficient basis for federal habeas relief.  *Kernan*, 197 F.3d

9   at 1031; *Estelle*, 502 U.S. at 67-68.  Hence, Petitioner's claim that the Superior Court's exclusion

10  of the Washington affidavit violated California evidence law, even if correct, does not justify

11  habeas relief; Petitioner must show that "a specific federal constitutional or statutory provision" is

12  violated or the error is of such magnitude that it "deprive[s] the defendant of the fundamentally

13  fair trial guaranteed by due process."  *Maass*, 45 F.3d at 1357.

14         In this regard, it is significant that Petitioner's argument concerns his right to

15  postconviction relief.  The U.S. Supreme Court has made clear that a habeas claimant's right to

16  due process "is not parallel to a trial right"; because the defendant "has already been found guilty

17  at a fair trial," his due process right is more "limited."  *Osborne*, 557 U.S. at 69.  Indeed, the

18  Constitution does not require states to provide postconviction relief to prisoners at all.

19  *Lackawanna Cty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001).  "When a State chooses to

20  offer help to those seeking relief from convictions, due process does not dictate the exact form

21  such assistance must assume."  *Id.* (internal quotations omitted).  "[T]he State accordingly has

22  more flexibility in deciding what procedures are needed in the context of postconviction relief."

23  *Id.*  For instance, "[t]here is no constitutional right to an attorney in state post-conviction

24  proceedings."  *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).  The U.S. Supreme Court has

25  likewise rejected a defendant's right of access to DNA evidence for use in postconviction

26  proceedings.  *Osborne*, 557 U.S. at 69.

27         The U.S. Supreme Court has never recognized a right to have newly discovered evidence

28  considered during postconviction proceedings—much less a right to have hearsay statements

50

United States District Court
Northern District of California

considered.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993).  The Ninth Circuit has also "specifically stated that federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings."  *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998).  For both reasons, Petitioner cannot show a violation of clearly established federal or constitutional law based on the Superior Court's refusal to admit evidence that is undisputedly hearsay.

In any event, the Court finds no error under California evidence law.  Petitioner argues that the Superior Court "relied heavily on the *Miles*, *supra*, decision to conclude that it did not have to take notice of an unreliable affidavit, but *Miles* is not good law."  Pet. at m-29.  This argument wholly mischaracterizes the Superior Court's ruling.  As explained above, it was Petitioner who sought admission of the affidavit under *Miles*; the Superior Court declined to do so, distinguishing *Miles* from the instant case.  That *Miles* has since been depublished only supports the Superior Court's decision not to rely upon it.

Petitioner also challenges the Court of Appeal's determination that Washington's affidavit lacked sufficient indicia of trustworthiness to justify its admission under *Miles*.  *See* Pet. at m-29.  But regardless of the affidavit's trustworthiness, Petitioner points to no authority under California law requiring a court to admit hearsay in the absence of a specific statutory exception.  Even *Miles*—which Petitioner emphasizes is "not good law"—did not hold that a court is required to admit hearsay evidence where there are other indicia of trustworthiness; indeed, the *Miles* court expressly stated that its "ruling regarding the admissibility of Bailey's declaration is not binding on the trial court."  *In re Miles*, 213 Cal. Rptr. 3d at 788.  The Court therefore rejects Petitioner's attempt to relitigate the issue of whether Washington's affidavit was trustworthy; the Superior Court was not required to admit it in any event.

For the foregoing reasons, the Court finds no merit in Petitioner's contention that the Superior Court's exclusion of the Washington affidavit amounted to constitutional error. Petitioner's claim for relief based on Claim 6 is DENIED.

### G.    Claim 7:  *Brady* Violation

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's

guilt or punishment.  *See Smith v. Cain*, 565 U.S. 73, 75 (2012).  Petitioner's Claim 7 is that the prosecution committed a *Brady* violation by failing to disclose "that Oakland police officers, including Steven No[w]ak, the chief investigator on this case, obtained and supplied $500 in reward money to eyewitness Green after trial, as a reward for his identifying and testifying against Petitioner."  Pet. at m-30.[10]  This claim was rejected by the Court of Appeal on collateral review, and the Court now rejects it as well.

### i.    Factual Background

Petitioner's original habeas petition, Case No. 17-CV-05195-BLF, laid out the factual basis for his *Brady* claim, and Petitioner now incorporates that material by reference.

Petitioner made a post-trial discovery request to the Alameda County District Attorney's Office regarding the possibility that eyewitness Robert Green might receive a reward through the Crime Stoppers program.  *See* ECF 18-16 at 72, 141.  The responsive documents indicated that following Petitioner's trial, Officer Nowak had recommended that Green receive the maximum Crime Stoppers reward; that request was apparently approved.  *See* ECF 18-16 at 143 (Exhibit 10 to Petition for Writ of Habeas Corpus before the California Court of Appeal, No. A137965).  In particular, Petitioner's claim relies upon an email written by Officer Nowak to Deputy District

---

[10] In his Petition, Petitioner sometimes misspells Officer Steve Nowak's name as "Novak."  Those errors have been altered in this Order.

United States District Court
Northern District of California

Attorney Norbert Chu, *see* Pet. at m-30:

> Hi Norbert,
>
> Can you please forward this to Ms Kobold per her request, I don't have her email.  I already talked to her and I advised her that the witness never asked for any reward or knew anything about Crime Stoppers or in fact any reward that was available for information related to this case.  The witness came forward on his own and just wanted to do the right thing on what he saw.  Crime Stoppers info only came to light when I asked him why he came forward and if he knew about a reward.  During the recorded interview it showed that the witness had no knowledge of any reward and he came forward only with the intent to do the right thing.  He was never promised anything for his assistance at anytime and he never asked any reward.
>
> After the case was over and after several months past I took it upon myself to ask Crime Stoppers for some money because nobody came forward with information and the fact he did the right thing I felt that a good deed should not go unnoticed, although he never asked.  After I had made the request to Crime Stoppers, I told him that I made a request but it is unknown if I will get anything because he came forward on his own but that I will try because he was a good person but there were no promises or guarantees because generally Crime Stoppers are to encourage people who have information but are not willing to come forward on their own and in his case he did it all on his own.
>
> Several weeks after I made the request I obtained several hundred dollars in an envelope I believe it was 500 dollars which I gave to Green.  Ofc J. Anderson was with me at his residence.
>
> Thanks,
>
> Steve Nowak

ECF 18-16 at 142 (Exhibit 10 to Petition for Writ of Habeas Corpus before the California Court of Appeal, No. A137965).

Based on these documents, Petitioner asserts that "Officer No[w]ak admits that he discussed a monetary reward with Green before he testified."  Pet. at m-30.  Petitioner further "alleges on information and belief that both officer No[w]ak and Green knew, prior to trial, that reward money was available and likely to be paid to Green."  *Id.*

### ii.  State Court Decision

The Court of Appeal summarily denied Petitioner's *Brady* claim in the state habeas portion of its consolidated order:

> Likewise, we find no merit in the claim that the prosecution committed Brady error (*Brady v. Maryland* (1963) 373 U.S. 83) by failing to disclose Green's "Crime Stopper" reward or engaged in misconduct by arguing at trial that Green "had nothing to gain" by testifying against defendant.  There is no indication in the allegations of the petition or the supporting exhibits that Green asked for or was promised the reward or knew prior to trial that he was likely to receive the reward for his testimony.

*People v. Smith*, 2013 WL 4017400, at *12.

### iii.  Discussion

United States District Court
Northern District of California

1    To reiterate, Petitioner claims that the prosecution committed a *Brady* violation by failing

2    to disclose prior to trial "that Oakland police officers, including Steven No[w]ak, the chief

3    investigator on this case, obtained and supplied $500 in reward money to eyewitness Green after

4    trial, as a reward for his identifying and testifying against Petitioner." Pet. at m-30. Below, the

5    Court finds that the record in this case does not vindicate Petitioner's claim.

6    "There are three components of a true *Brady* violation: The evidence at issue must be

7    favorable to the accused, either because it is exculpatory, or because it is impeaching; that

8    evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

9    must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). In this case, Petitioner's claim

10   falls short at the very first component.

11   As it is undisputed that Green was not given a reward until after trial, the evidence that

12   Petitioner says was not disclosed prior to trial is that "No[w]ak and Green knew, prior to trial that

13   reward money was available and likely to be paid to Green." Pet. at m-30. The only support

14   Petitioner cites for this claim is the above email, in which Officer No[w]ak supposedly "admits

15   that he discussed a monetary reward with Green before he testified." Pet. at m-30. Yet, Petitioner

16   fails to point to any particular passage of the email containing the alleged "admission." On the

17   contrary, Officer Nowak specifically avers that "[Green] was never promised anything for his

18   assistance at anytime [sic] and he never asked [for] any reward." Officer Nowak further states that

19   Green "never . . . knew anything about Crime Stoppers or in fact any reward that was available for

20   information related to this case," that a "recorded interview . . . show[s] that the witness had no

21   knowledge of any reward and he came forward only with the intent to do the right thing." Officer

22   Nowak explains that he later "took it upon [him]self to ask Crime Stoppers for some money"

23   because he "felt that a good deed should not go unnoticed, although [Green] never asked." These

24   statements contradict Petitioner's unsupported allegation that Officer Nowak "admitted" to having

25   discussed a reward with Green before trial.

26   The Court therefore rejects Petitioner's contention that Officer Nowak's email evinces any

27   exculpatory facts. As Petitioner cites no other evidence that was allegedly suppressed by the state,

28   the Court must DENY Claim 7.

United States District Court
Northern District of California

### H.    Claim 8: Cumulative Prejudice

Claim 8 is one of cumulative prejudice.  Pet. at m-31 to m-32.  The Ninth Circuit has held that, in exceptional cases, while no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003).  However, cumulative error can only be present where no single error is sufficiently prejudicial, but the effect of multiple errors compounds one another's impact.  *See Alcala*, 334 F.3d at 893–95.  Where, as here, "there is no single constitutional error ..., there is nothing to accumulate to a level of constitutional violation."  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *see also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (holding that where no error reaches constitutional magnitude on habeas review, no cumulative error is possible).  Petitioner's claim that cumulative error requires reversal of his conviction is meritless.

## V.    REQUEST FOR EVIDENTIARY HEARING

In his Amended Petition, Rushing makes a general request for an evidentiary hearing as to his claims.  *See* Pet. at p-12.  Rushing has made no arguments in support of his request, however, and Rushing's claims do not appear to raise any factual disputes that require an evidentiary hearing.  *See Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (when state court record precludes habeas relief under § 2254(d), district court not required to hold evidentiary hearing).  Accordingly, the request for an evidentiary hearing is DENIED.

## VI.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

United States District Court
Northern District of California

Here, petitioner has not made such a showing; accordingly, a certificate of appealability will not issue.

**VII.    ORDER**

In sum, the Court rejects all eight of Petitioner's claims.  Petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is, therefore, DENIED.  His request for an evidentiary hearing is likewise DENIED.

**IT IS SO ORDERED.**

Dated: May 12, 2020

_____
BETH LABSON FREEMAN
United States District Judge